WORLD HELP, Appellant,

v.

LEISURE LIFESTYLES, INC., Kingdom Properties, Inc. and Turner Construction Company of Texas, Inc., Appellees.

No. 2–96–260–CV.

Court of Appeals of Texas, Fort Worth.

June 4, 1998.

Rehearing Overruled Sept. 24, 1998.

Bourland, Kirkman, Seidler & Evans, David L. Evans, Thomas M. Michel, Fort Worth, for Appellant.

Flourney & Deaton, Robert L. Flourney, Zeleskey, Cornelius, Hallmark, Roper & Hicks, James R. Cornelius, Lufkin, Quilling, Selander, Cummisky, Clutts & Lownds, P.C., Brian W. Erikson, Dallas, for Appellees.

Before CAYCE, C.J., and LIVINGSTON and BRIGHAM, JJ.

## OPINION

CAYCE, Chief Justice.

### I. Introduction and Background

This case raises numerous lien priority and breach of contract issues, primarily arising out of two loan transactions between appellee Leisure Lifestyles, Inc. (Leisure) and appellant World Help's predecessor, Church and Institutional Facilities Development Corporation (C & I). We affirm in part, reverse and remand in part, and reverse and render in part. We set out the facts pertinent to the parties' points and cross points under our discussions of those points, but an overview of the facts and this case's procedural history is also necessary.

In September 1988, Leisure and C & I closed on a loan that allowed Leisure to purchase property in Granbury, Texas known as Rylee's Landing (the acquisition loan). The acquisition loan documents gave C & I vendor's and deed of trust liens on Rylee's Landing for the full amount of the acquisition loan. In June 1989, Leisure and C & I closed on a second loan, the proceeds of which were to be used to develop Rylee's Landing as a retirement center (the development loan). The development loan documents gave C & I a deed of trust lien on Rylee's Landing for the full amount of the development loan.

In May 1989, Leisure contracted with appellee Turner Construction Company of Texas, Inc. (Turner) for Turner to construct improvements to Rylee's Landing. Turner began work on Rylee's Landing during the summer of 1989. At some point, Leisure also entered into a contract with appellee Kingdom Properties, Inc. (Kingdom) for the actual development of the retirement center. Kingdom advanced funds for the retirement center.

C & I fully funded the acquisition loan but funded only a fraction of the development loan before filing bankruptcy in early October 1989. After C & I filed bankruptcy, Leisure was unable to pay Turner's applications for progress payments under the construction contract. Because its pay applications went unpaid, Turner filed mechanic's and materialman's liens against Rylee's Landing. Turner reduced the liens to judgment in November 1993.

Kingdom also filed mechanic's and materialman's liens against Rylee's Landing because Leisure failed to pay Kingdom's development fees. Kingdom's liens were reduced to judgment in November 1993.

Meanwhile, in December 1992, World Help purchased the acquisition and development loan promissory notes, the corresponding deeds of trust, and the warranty deed with vendor's lien (collectively, the Leisure documents) from C & I's bankruptcy trustee. In February 1993, Hood County Appraisal District (HCAD) sued Leisure, C & I, Turner, and Kingdom for delinquent ad valorem taxes due on Rylee's Landing for the years 1989 through 1992. HCAD amended its petition in September 1993 to delete C & I as a party and add World Help as a party. In January 1994, World Help paid the delinquent taxes, as well as the 1993 taxes on Rylee's Landing.

In January 1995, World Help moved for summary judgment (1) that its vendor's and deed of trust liens on Rylee's Landing had priority over Turner's and Kingdom's liens, and (2) that because World Help had paid the 1989 through 1993 property taxes, it was equitably subrogated to HCAD's first priority tax liens.

In June 1995, the trial court granted World Help's motion to realign the parties and designated World Help as plaintiff and Leisure, Turner, and Kingdom as defendants. In July 1995, Turner and Kingdom moved for summary judgment that their liens had priority over World Help's liens based on the doctrine of equitable subordination.

In October 1995, the trial court entered a partial summary judgment, ruling that (1) World Help's liens were superior to Turner's and Kingdom's to the extent of $34,860 (the amount of the 1993 property taxes), (2) Turner's liens were superior to World Help's remaining liens and Kingdom's liens, and (3) Kingdom's liens were superior to World Help's remaining liens. In December 1995, Kingdom foreclosed on its liens and purchased Rylee's Landing at a sheriff's sale.

In January 1996, the trial court entered an order denying the rest of World Help's motion for summary judgment. The remaining issues in the case were tried to the court. In its May 1996 final judgment, the trial court:

- rendered judgment for World Help against Leisure for $34,860 (the amount of the 1993 ad valorem taxes);
- denied World Help's claim to recover from Leisure for payment of the 1989 through 1992 ad valorem taxes;
- rendered judgment for World Help against Leisure on the promissory notes in the amount of $2,101,937 plus $31,673 in prejudgment interest ($2,133,610 total);
- reaffirmed the priorities of World Help's, Turner's, and Kingdom's liens as set forth in the October 1995 interlocutory summary judgment;
- denied World Help's claim to the rental proceeds from Rylee's Landing (except to satisfy the claim for the 1993 ad valorem taxes);
- granted Turner a lien of $195,220 against the proceeds that World Help recovers from Leisure (a) after World Help fully recovers the 1993 ad valorem taxes, and (b) reduced by any amount Turner recovers on its liens;
- rendered judgment that World Help's lien for the 1993 ad valorem taxes survived the December 1995 foreclosure of Kingdom's liens;
- ordered Leisure and Kingdom to pay all pre- and post-foreclosure rental receipts to World Help on demand until World Help recovers the full amount of the 1993 ad valorem taxes;
- awarded World Help pre- and post-judgment interest on the judgment against Leisure for the 1993 ad valorem taxes and on the promissory notes; and
- denied all requests for attorney's fees.

## II. Summary of Appellate Issues

In this appeal we must decide whether:

- the trial court properly granted summary judgment on the priorities of World Help's, Turner's, and Kingdom's liens;
- World Help has a security interest in and is therefore entitled to the rental proceeds from Rylee's Landing;
- the trial court properly granted Turner an equitable lien on the rental proceeds;
- the acquisition and development loans constituted a single contract between Leisure and C & I;
- sufficient evidence supports the trial court's findings that C & I breached its agreement with Leisure when Leisure was not in default on its obligations to C & I;
- the trial court properly ruled that World Help is not equitably subrogated to HCAD's lien position regarding the property taxes except for the 1993 taxes;
- World Help can recover from Leisure for payment of the delinquent property taxes;
- World Help can enforce the promissory notes and deeds of trust against Leisure;
- the trial court properly denied World Help attorney's fees; and
- the trial court properly denied Turner attorney's fees.

## III. Equitable Subordination

In its first point, World Help complains that the trial court erred in granting summary judgment that World Help's vendor's and deed of trust liens on Rylee's Landing are equitably subordinated to Turner's and Kingdom's liens. In point two, World Help complains that the trial court improperly rendered final judgment on this issue.

### A. Standard of Review

In a summary judgment case, the issue on appeal is whether the movant met its summary judgment burden by establishing that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. *See* TEX.R. CIV. P. 166a(c); *Cate v. Dover Corp.*, 790 S.W.2d 559, 562 (Tex.1990); *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex.1979). The burden of proof is on the movant and all doubts about the existence of a genuine issue of a material fact are resolved against the movant. *See Acker v. Texas Water Comm'n*, 790 S.W.2d 299, 301–02 (Tex.1990); *Cate*, 790 S.W.2d at 562; *Great Am. Reserve Ins. Co. v.*

*San Antonio Plumbing Supply Co.*, 391 S.W.2d 41, 47 (Tex.1965). Therefore, we must view the evidence and its reasonable inferences in the light most favorable to the nonmovant. *See Great Am.*, 391 S.W.2d at 47.

In deciding whether there is a material fact issue precluding summary judgment, all conflicts in the evidence will be disregarded and the evidence favorable to the nonmovant will be accepted as true. *See Harwell v. State Farm Mut. Auto. Ins. Co.*, 896 S.W.2d 170, 173 (Tex.1995); *Montgomery v. Kennedy*, 669 S.W.2d 309, 311 (Tex.1984). Evidence that favors the movant's position will not be considered unless it is uncontroverted. *See Great Am.*, 391 S.W.2d at 47. The summary judgment will be affirmed only if the record establishes that the movant has conclusively proved all essential elements of its cause of action or defense as a matter of law. *See City of Houston*, 589 S.W.2d at 678.

▇ The parties agree that C & I's vendor's and deed of trust liens on Rylee's Landing were prior in time to both Turner's and Kingdom's mechanic's and materialman's liens. In a contest over rights or interests in property, ordinarily the party that is first in time is first in right. *See Church v. Western Fin. Corp.*, 22 S.W.2d 1074, 1075 (Tex.Civ. App.—San Antonio 1929, no writ). World Help acquired C & I's lien rights when it purchased the Leisure documents from C & I's bankruptcy estate. Thus, absent an exception to the general rule, World Help's lien rights would be superior to both Turner's and Kingdom's.

But Turner and Kingdom assert that the trial court properly subordinated World Help's lien rights to theirs because of C & I's inequitable conduct.

▇ Equitable subordination is not a cause of action; it is a remedy. *See First Heights Bank, FSB v. Gutierrez*, 852 S.W.2d 596, 613 (Tex.App.—Corpus Christi 1993, writ denied). This remedy is not available absent a finding that the party with a superior lien or claim engaged in false or inequitable conduct that conferred an unfair advantage on itself or injured third parties. *See Farm Credit Bank v. Ogden*, 886 S.W.2d 305,

313 (Tex.App.—Houston [1st Dist.] 1994, no writ) (equitable subordination not available because lien holder did nothing inequitable); *First Heights Bank*, 852 S.W.2d at 602, 604, 613 (bank's lien rights subordinated because its predecessor's president committed fraud); *see also In re Fabricators, Inc.*, 926 F.2d 1458, 1464–65 (5th Cir.1991) (applying equitable subordination to secured creditor's claims in bankruptcy proceeding). "[A] prior lien gives a prior claim ... unless the lien be ... displaced by some act of the party holding it, which shall postpone him in a court of law or equity to a subsequent claimant." *First Heights Bank*, 852 S.W.2d at 609 (quoting *Rankin v. Scott*, 25 U.S. 177, 179 (12 Wheat. 177), 6 L.Ed. 592 (1827)).

▇ Whether inequitable conduct has occurred sufficient to warrant equitable subordination is a fact question. *See In re Herby's Foods, Inc.*, 2 F.3d 128, 130 (5th Cir.1993); *Fabricators*, 926 F.2d at 1465. Thus, a trial court's decision to subordinate lien rights under this doctrine must be based upon fact findings that inequitable conduct occurred *and* that the conduct was so inequitable that it warrants lien subordination.

▇ In their appellate brief, Turner and Kingdom assert that we must determine whether it was appropriate for the trial court to subordinate World Help's liens to theirs "based on [C & I's] breach of contracts"—its failure to fund the development loan and its alleged breach of a letter agreement with Turner. But a lender's failure to fund a loan, without more, does not support equitable subordination. *See In re CTS Truss, Inc.*, 868 F.2d 146, 149 (5th Cir.1989). Rather, to establish its entitlement to this remedy, the injured party must prove conduct so inequitable that it "shocks one's good conscience." *In re Orah Wall Fin. Corp.*, 84 B.R. 442, 444 (Bankr.W.D.Tex.1986).

Because equitable subordination is an extraordinary remedy, courts have limited its application to three categories of cases:

• those in which a fiduciary of the debtor misuses its position to the disadvantage of other creditors;

- those in which a third party, in effect, controls the debtor to the disadvantage of others; and
- those in which a third party defrauds other creditors.

See *CTS Truss,* 868 F.2d at 148–49; *see also First Heights Bank,* 852 S.W.2d at 613.

Although actual fraud need not be shown to obtain equitable subordination, cases in which no showing of fraud is required are generally bankruptcy cases involving insider misconduct. *See Herby's Foods,* 2 F.3d at 133–34 (insiders of debtor undercapitalized debtor, thereby harming unsecured creditors); *In re Multiponics, Inc.,* 622 F.2d 709, 715, 720–21 (5th Cir.1980) (founder, director, and substantial shareholder of debtor engaged in inequitable conduct). In the bankruptcy context, "insiders" include a corporate debtor's directors and officers, persons in control of the corporation, and their relatives. *See* 11 U.S.C.A. § 101(31) (West 1993). If a claimant is not an insider, then evidence of more egregious conduct, such as fraud, spoliation, or overreaching is necessary. *See Fabricators,* 926 F.2d at 1465.

We are not aware of any nonbankruptcy Texas case in which a court has equitably subordinated lien rights absent a finding of fraud on the part of the superior lien holder or its predecessor. *See First Heights Bank,* 852 S.W.2d at 613 (jury found president of lien holder's predecessor committed fraud); *see also Young v. Terrace Improvement Co.,* 62 S.W.2d 180, 184 (Tex.Civ.App.—El Paso 1933, no writ) (holding that evidence that bond issuer intentionally mislead investors raised fact issues as to fraud and whether bond holders were entitled to equitable subordination).

In this case, there is neither evidence nor allegation that C & I was Leisure's fiduciary or that C & I controlled Leisure, i.e., was an insider. Thus, to prevail on their motions for summary judgment, Turner and Kingdom had to establish as a matter of law that C & I defrauded them.

## B. Turner's Motion for Summary Judgment

■ In its motion for summary judgment, Turner contended that equitable subordination was proper because C & I induced Turner to work on Rylee's Landing by providing Turner written assurance that C & I would pay Turner for its work. Then C & I breached this commitment to Turner and did not pay Turner's pay applications. Also, because C & I breached its agreement with Leisure by failing to fund the development loan, Leisure could not pay Turner. C & I's conduct was so inequitable that it warranted subordination of C & I's lien rights. As C & I's assignee, World Help acquired no better lien rights than C & I had; therefore, World Help's lien rights should also be subordinated to Turner's.[1]

In its cross-claim against World Help, Turner asserted a claim for "equitable subordination" based on its contention that "C & I's breaches resulted from fraud, negligence, and/or other culpable conduct...." Because Turner had to plead and prove fraud to obtain equitable subordination, we will treat this pleading as an allegation that C & I defrauded Leisure and Turner with respect to the development loan and the letter agreement and that Turner was harmed as a result.

■ The elements of fraud are: (1) a false, material representation; (2) that was either known to be false when made or was made without knowledge of its truth; (3) that was intended to be acted upon; (4) that was relied upon; and (5) that caused injury. *See Formosa Plastics Corp. USA v. Presidio*

---

**1.** Turner also asserted the right to equitable subordination as follows: C & I could not recover from Leisure for breach of contract because C & I breached first; therefore World Help, as C & I's transferee, also could not recover from Leisure. This is a defense to a breach of contract claim, not a basis for equitable subordination. The issue at summary judgment was not whether World Help could recover in contract from Leisure but whether C & I's misconduct was harmful to *Turner* and, if so, whether that conduct was so inequitable that Turner should be awarded the remedy of equitable subordination.

Further, Turner did not assert, and the trial court did not find, that Turner was a party to the Leisure–C & I contract. Therefore, Turner had no standing to assert the breach of contract defense against World Help. Leisure also asserted this defense against World Help, and we address Leisure's arguments in section VII.

*Eng'rs and Contractors, Inc.,* 960 S.W.2d 41, 47 (Tex.1998). The mere failure to perform a contract is not evidence of fraud. But a promise of future performance is actionable if—at the time the promise was made—the promisor intended to deceive and had no intention of performing. *See id.; Spoljaric v. Percival Tours, Inc.,* 708 S.W.2d 432, 434 (Tex.1986).

Intent is a fact question "uniquely within the realm of the trier of fact because it so depends upon the credibility of the witnesses and the weight to be given to their testimony." *Spoljaric,* 708 S.W.2d at 434. A party's intent is determined at the time of the representation, but it may be inferred from the party's acts after the representation was made. Although the failure to perform, standing alone, is not evidence of the promisor's intent not to perform, it may be considered with other factors to establish intent. *See id.* at 434–35.

False representations can arise from silence as well as affirmative statements. "When the particular circumstances impose on a person a duty to speak and he deliberately remains silent, his silence is equivalent to a false representation." *Id.* at 435. A party has an affirmative duty to disclose where there is a confidential or fiduciary relationship or where a party later learns that a previous affirmative representation was false or misleading. *See Palm Harbor Homes, Inc. v. McCoy,* 944 S.W.2d 716, 722 (Tex.App.—Fort Worth 1997, orig. proceeding); *Formosa Plastics Corp. v. Presidio Eng'rs and Contractors, Inc.,* 941 S.W.2d 138, 147 (Tex.App.—Corpus Christi 1995), *rev'd on other grounds,* 960 S.W.2d 41 (Tex. 1998). A duty to disclose also arises when one party knows that the other party is relying on the concealed fact, provided that he knows that the relying party is ignorant of the facts and does not have an equal opportunity to discover the truth. *See Libhart v. Copeland,* 949 S.W.2d 783, 801 (Tex.App.—Waco 1997, no writ). In addition, when one voluntarily discloses information, he has a duty to disclose the whole truth rather than making a partial disclosure that conveys a false impression. *See Formosa Plastics,* 941 S.W.2d at 147.

To support its motion for summary judgment, Turner relied on the following evidence: Kingdom's wholly-owned subsidiary, Keechi Development Corporation (Keechi), owned Rylee's Landing. Rylee's Landing was situated on 5.748 acres of lake-front property in Granbury, Texas. Improvements on the site in 1986 included a club house, three apartment buildings, a swimming pool, tennis courts, and the 130–year-old Rylee Aiken House. Kingdom wanted to develop Rylee's Landing as a retirement center. In 1986, Kingdom obtained architectural and marketing studies to determine whether developing a retirement center was feasible.

In early 1986, C. Frank Myer, a broker for AMI Securities, Inc. (AMI), put Kingdom in touch with AMI. AMI specialized in debt instruments issued by nonprofit corporations, primarily churches. AMI also provided financial consulting services to nonprofit issuers of financial securities. AMI wanted to market its services to issuers involved in the development of church-related facilities, such as retirement centers. Kingdom and AMI investigated and negotiated potential sources of financing for the retirement center at Rylee's Landing from early 1986 through late summer 1987. David Sanders conducted the negotiations on Kingdom's behalf and dealt primarily with AMI's president, Willard May.

Leisure was incorporated in June 1987 as a nonprofit Texas corporation to develop, own, and operate the planned retirement center. Kingdom continued to be responsible for the retirement center's actual development. Sanders supervised Leisure's corporate organization and served as its president. Thus, Sanders acted in two capacities—as Leisure's president and as Kingdom's representative.

In late summer 1987, May told Sanders that AMI planned to form a new entity, C & I, to issue bonds and make first mortgage loans to nonprofit borrowers. C & I eventually issued a series of $20 million worth of bonds. AMI sold C & I's bonds and also made and administered loans on C & I's behalf.

May and Sanders considered four different plans for financing the retirement center.

May told Sanders numerous times that C & I would finance, as one complete deal, the acquisition of the land and the construction of the retirement center by lending Leisure $10.4 million. Leisure—through Sanders—relied on May's assurances and entered into the transaction to acquire Rylee's Landing and complete the retirement center there. C & I loaned Leisure the money to buy Rylee's Landing from Keechi in September 1988. AMI administered the acquisition loan for C & I.

Between 1986 and September 1988, Kingdom advanced $250,000 for the retirement center. Although the acquisition loan funded the purchase of Rylee's Landing and its then-existing improvements, it did not provide cash so that Leisure could service its debt, fund marketing costs, or reimburse Kingdom for the $250,000 it had advanced towards the project. Sanders agreed to close on the acquisition loan in September 1988 only because May had assured him that a second loan would provide for debt service, marketing costs, and Kingdom's development fees and would be funded by November 1988. After September 1988, Kingdom continued to manage the project and its development with May's consent and with the promise that C & I would fund the cost for Leisure to pay Kingdom.

Although May had promised to fund a second, development loan by November 1988, he failed to do so and, despite Sanders's urging, kept postponing this financing. On March 28, 1989, May told Sanders that Trust Company of America (TCOA) was being investigated by the Texas Banking Commissioner. TCOA was the trust company for C & I's $20 million bond issue, out of which C & I was to provide Leisure's financing for the retirement center project. Also on March 28, 1989, May told Sanders that another creditor was in default on large amounts of money borrowed through AMI, TCOA, or C & I. May told Sanders these defaults were the reason for the delay in financing construction of the retirement center but assured Sanders he should have full confidence that the entire transaction would be financed.

On May 15, 1989, with May's and C & I's full knowledge and consent, Leisure entered into a construction contract with Turner. The construction contract provided that Turner would begin construction in June 1989 after C & I provided written assurance of adequate funding to make progress payments to Turner under the contract. C & I and Leisure finally closed on the development loan on June 8, 1989. The loan was for $4,855,000. AMI administered the loan for C & I.

Blaine Lee, the manager of Turner's Dallas office, wrote to AMI asking for assurance that adequate funds had been set aside to make progress payments to Turner under the construction contract. In response, C & I provided Turner a letter dated June 21, 1989 that stated: (1) $2,652,000 of the development loan proceeds had been allocated for progress payments to Turner; and (2) C & I would make periodic payments directly to Turner upon approval of Turner's pay applications. Lee signed the letter agreement indicating Turner's acceptance and returned it to C & I.[2]

Leisure asked C & I to advance $600,000 of the development loan proceeds. C & I made advances totaling $402,591 during the summer of 1989. Also during the summer of 1989, Turner submitted pay applications 1 through 3 under the construction contract for $45,919. Leisure paid the applications out of the advance from C & I.

In September and October 1989, Turner submitted pay applications 4 through 6 for work completed from August 26 through Oc-

---

**2.** At trial, World Help objected to admission of the June 1989 letter agreement because the copy Turner offered was signed only by C & I's representative and not by Lee. But World Help did not object to Lee's statement in his summary judgment affidavit that he had signed and returned the letter. Accordingly, the objection is waived on appeal as it pertains to the summary judgment. *See Utilities Pipeline Co. v. American Pe-* *trofina Mktg.,* 760 S.W.2d 719, 722–23 (Tex. App.—Dallas 1988, no writ). We may consider the uncontroverted testimonial evidence of an interested witness if the evidence is clear, positive and direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted. *See* TEX.R. CIV. P. 166a(c).

tober 31, 1989. Turner requested a total of $133,705 on those applications. Although Leisure accepted the applications and submitted them to C & I for approval, C & I did not pay them or advance funds to pay them. But the summary judgment record contains some evidence that Turner did not satisfy all the prerequisites to payment listed in the letter agreement.

The summary judgment record does not show that Leisure or C & I paid Kingdom anything. C & I did not advance Leisure any more funds under the development loan. Instead, C & I filed bankruptcy on October 2, 1989.

After C & I went into bankruptcy, Sanders learned that, on March 7, 1989, the Texas Banking Commissioner had issued a cease and desist order and an order of supervision against TCOA. When May made his March 28 representations, the Texas Banking Commissioner was suing TCOA in federal court. On March 21, 1989, the federal court had entered an agreed temporary restraining order against TCOA that, among other things, made it impossible for C & I to proceed with the $20 million bond issue it planned to use to finance the development of the retirement center. May did not tell Sanders about the cease and desist order, the federal lawsuit, or the temporary restraining order. If he had, Sanders never would have signed the development loan documents on Leisure's behalf in June 1989. However, the summary judgment record does not affirmatively show that May knew about the federal lawsuit or the restraining order in March 1989 when he told Sanders about the investigation of TCOA or in June 1989 when C & I and Leisure closed on the development loan.

On April 27, 1990, Turner submitted pay application 7 for work performed from October 31, 1989 through April 30, 1990. Turner requested $20,256 on that application. Although Leisure accepted and submitted the application, C & I's bankruptcy estate did not pay it or advance funds to pay it. Be-

cause Turner's pay applications 4 through 7 went unpaid, Turner filed mechanic's and materialman's liens against Rylee's Landing for $153,961, the total amount of the unpaid applications. Turner reduced the liens to judgment in November 1993.

This evidence does not establish each element of fraud as a matter of law. For instance, the evidence does not conclusively establish that C & I promised to fund the development loan with no intention of performing that promise, or that C & I entered into the letter agreement with no intention of performing it. May's March 1989 statements to Sanders, coupled with the entry of the agreed temporary restraining order in the TCOA lawsuit, are some evidence that the development loan documents and the letter agreement contained false representations that C & I knew to be false.[3] May had an affirmative duty to communicate what he knew about the TCOA lawsuit and C & I's ability to perform its commitments to Leisure and Turner. *See Libhart,* 949 S.W.2d at 801; *Formosa Plastics,* 941 S.W.2d at 147. But the summary judgment evidence does not conclusively establish that May knew about the TCOA lawsuit or the restraining order in March 1989. There is no summary judgment evidence of what relationship May had with TCOA. Also, the evidence does not show what May or C & I knew in June 1989.

When reviewing the summary judgment evidence, we must view every reasonable inference in the light most favorable to World Help, the nonmovant. *See Great Am.,* 391 S.W.2d at 47. One inference is that May only knew about the banking commissioner's investigation of TCOA and not about the lawsuit or the restraining order. Absent uncontroverted evidence, we cannot infer that May knew in either March or June 1989 that C & I could not fund the development loan; therefore, we cannot infer that C & I did not intend to fund the loan or perform its contract with Turner.

---

**3.** C & I was formed sometime between late summer 1987 and September 1988, when it closed on the acquisition loan. We attribute May's knowledge and conduct that occurred after C & I's inception to C & I because, as AMI's presi-

dent, May told Sanders that AMI planned to form C & I to make first mortgage loans to nonprofit borrowers like Leisure and because AMI later made and administered loans on C & I's behalf.

In addition, even if Turner had established fraud as a matter of law, it did not conclusively establish that all of its liens should take priority over World Help's liens. Lien priorities should be subordinated only to the extent necessary to offset the harm done by the inequitable conduct.[4] *See CTS Truss*, 868 F.2d at 149 (citing *In re Mobile Steel Co.*, 563 F.2d 692, 701 (5th Cir.1977)). The summary judgment evidence shows that Turner submitted a pay application as late as April 1990 for work performed from October 31, 1989 through April 30, 1990, even though C & I filed bankruptcy on October 2, 1989. Thus, a fact issue exists concerning whether Turner is entitled to a superior lien position based on work performed on the retirement center *after* it knew or should have known that C & I had filed bankruptcy. The fact finder must determine whether nonpayment for Turner's continued work on the retirement center after C & I filed bankruptcy was harm caused by C & I's fraud, or whether it was merely a risk that Turner took with knowledge that it might not be paid.

Because the summary judgment evidence does not conclusively establish that C & I committed fraud or the extent of the harm that the alleged fraud caused Turner, the trial court erred in granting summary judgment for Turner and in ruling that World Help's mortgage liens should be subordinated to the entire amount of Turner's liens.

### C. Kingdom's Motion for Summary Judgment

In its motion for summary judgment, Kingdom adopted Turner's statement of facts and all of the exhibits Turner attached to its motion for summary judgment. Kingdom also adopted "the same position as Turner ... as to the law and the facts ... except Kingdom has agreed that Turner will be superior to Kingdom in payment," i.e., that Turner's liens would take priority over Kindgom's.

We hold that the trial court also erred in granting summary judgment for Kingdom. As in Turner's case, the summary judgment evidence does not show as a matter of law that C & I committed fraud that harmed Kingdom. In addition to the fact issue about C & I's intent, the summary judgment evidence does not conclusively establish that Kingdom's reliance on May's assurances of funding was reasonable. *See American Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 436 (Tex.1997) (holding that defrauded party must show that its reliance on fraudulent representations or nondisclosure was reasonable).

Because Sanders was Kingdom's agent as well as Leisure's, we will attribute his knowledge to Kingdom. The summary judgment evidence shows that, by late March 1989, Sanders knew of the investigation of TCOA, which could negatively impact C & I's ability to fund the development loan. At that time, Sanders also knew that one of C & I's other borrowers had defaulted on its loans, forcing C & I to delay funding Leisure's loan. There is no summary judgment evidence that May or C & I ever provided information that either of these situations had been resolved in a way that would allow C & I to fully fund the development loan. Thus, we cannot infer that, from March 1989 onward, Kingdom reasonably relied on May's assurances that C & I would advance funds to pay Kingdom.

Further, Kingdom did not put on any evidence that its damages were caused by C & I's alleged fraudulent conduct. The summary judgment evidence shows only that C & I may have defrauded Leisure with regard to the *development loan*, which closed in June 1989. Yet the evidence also shows that Kingdom advanced $250,000 towards the retirement center project between 1986 and September 1988, when the *acquisition loan* closed. There is no evidence that any of the $250,000 was advanced because of C & I's fraudulent conduct. Accordingly, there is no evidence that C & I's conduct caused $250,000 of the damages Kindgom claims.

In his summary judgment affidavit, Sanders stated that, in hindsight, "it is now clear that May knew, before the first Note was

---

4. In this case, the only inequitable conduct that could support equitable subordination would be

C & I's fraud. *See* supra pp. 668–69.

signed, that C & I was in trouble, but he kept leading us to believe that they could and would fund the entire acquisition and construction package for the Rylee's Landing project." This statement is a speculative, conclusory allegation. It is not supported by any summary judgment evidence and is not itself summary judgment evidence. *See Texas Division–Tranter, Inc. v. Carrozza,* 876 S.W.2d 312, 314 (Tex.1994) (holding that plaintiff's statement of his subjective beliefs will not support motion for summary judgment); *Anderson v. Snider,* 808 S.W.2d 54, 55 (Tex.1991) (holding that conclusions are not competent summary judgment evidence). Based on the summary judgment record, evidence that C & I might not have been able to fund the development loan first appeared when C & I did not close on the development loan in November 1988 as initially promised. In addition, C & I was not even formed until late summer 1987, at the earliest. We question how C & I could be liable automatically for amounts that Kingdom invested in the retirement center before C & I's existence.

In short, Kingdom did not put on summary judgment evidence to show what amount of its alleged damages occurred as a result of C & I's conduct. Kingdom contends C & I's failure to fund the development loan caused Leisure to be unable to pay Kingdom $503,-747 (including the aforementioned $250,000) for management and property development services. The summary judgment record does not contain any evidence showing how Kingdom arrived at this figure.

Likewise, Kingdom did not put on any evidence of what amount of its alleged damages are secured by liens against Rylee's Landing. The only summary judgment evidence that Kingdom filed any liens against Rylee's Landing is the November 1993 agreed judgment between Turner, Kingdom, and Leisure. That judgment merely recites: (1) Kingdom obtained a judgment against Leisure for $503,747 for Leisure's breach of its development and management contracts with Kingdom; and (2) Kingdom's liens against Rylee's Landing were judicially recognized but were secondary and inferior to Turner's. The judgment does not state what amount of money was secured by Kingdom's

liens. While Turner, Kingdom, and Leisure might agree on the facts underlying the agreed judgment, we cannot accept them as true for summary judgment purposes absent uncontroverted supporting evidence.

Because the summary judgment evidence does not conclusively establish that C & I's alleged fraud harmed Kingdom, the amount of Kingdom's damages, or that Kingdom's damages are secured by liens against Rylee's Landing, the trial court erred in granting summary judgment for Kingdom and in ruling that World Help's liens should be subordinated to Kingdom's liens.

We sustain World Help's first and second points.

### D. World Help's Motion for Summary Judgment

In point three, World Help complains that the trial court erred by denying World Help's summary judgment that its mortgage liens had priority over Turner's and Kingdom's liens and in failing to incorporate that ruling into the final judgment.

World Help's motion for summary judgment preceded Turner's and Kingdom's motions chronologically. In its motion, World Help sought summary judgment that its vendor's and deed of trust liens had priority over Turner's and Kingdom's liens and that World Help became equitably subrogated to HCAD's tax liens asserted against Rylee's Landing. We discuss World Help's equitable subrogation claim in section X.

Turner and Kingdom opposed a summary judgment establishing the superiority of World Help's vendor's and deed of trust liens based on much of the same evidence that we discussed under points one and two. Although Turner and Kingdom's evidence did not establish *their* entitlement to summary judgment as a matter of law, it did raise fact issues about whether C & I committed fraud that harmed Turner and Kingdom and about the extent of that harm. Because of these fact issues, World Help, as C & I's assignee, did not establish its superior lien priorities as a matter of law and was not entitled to summary judgment on that issue. Thus, the issue of who is entitled to a final judgment on

the lien priority issue is premature; it must be decided after a trial on the merits.

We overrule point three.

## IV. Turner's Equitable Lien

In its ninth point, World Help complains that the trial court improperly granted Turner a lien against World Help because Turner had no right to such a lien. In its final judgment, the trial court granted Turner a lien of $195,220 [5] against the rental proceeds that World Help recovers from Leisure, (1) after World Help fully recovers the 1993 ad valorem taxes, and (2) reduced by any amounts Turner recovers on its liens against Rylee's Landing.

World Help and Turner agree that Turner's lien against the rental proceeds is not a common-law possessory lien, a statutory lien, or an express contractual lien. However, Turner asserts that the trial court properly granted Turner an equitable lien "to enforce the court's priority of liens, and to atone for C & I's inequitable conduct in breaching its contracts with Turner and Leisure in the first place."

We have held that the trial court's summary judgment granting Turner superior lien status was erroneous because Turner did not establish as a matter of law that C & I's conduct was so inequitable as to warrant subordination of its—or World Help's—mortgage lien rights. Thus, the trial court's summary ruling on lien priorities cannot be a proper basis for awarding Turner an equitable lien against the rental proceeds.

■ Moreover, a party seeking an equitable lien must request this remedy in its pleadings. *See Warner Comm'ns, Inc. v. Keller*, 888 S.W.2d 586, 598 (Tex.App.—El Paso 1994), *rev'd on other grounds*, 928 S.W.2d 479 (Tex.1996); *see also Hoarel Sign Co. v. Dominion Equity Corp.*, 910 S.W.2d 140, 143 (Tex.App.—Amarillo 1995, writ denied). In its pleadings, Turner only asked that its mechanic's and materialman's liens be given priority over World Help's liens;

Turner did not plead for an equitable lien on the rental proceeds.

Because Turner neither pleaded for nor established its entitlement to an equitable lien on the rental proceeds from Rylee's Landing, the trial court's judgment for Turner on this issue is erroneous. We sustain point nine.

## V. The Leisure–C & I Contract

■ In point eleven, World Help contends that the evidence is legally and factually insufficient to support the trial court's finding that the two loans between Leisure and C & I constituted one contract. However, because the documents in this case are unambiguous, their construction was—and is—a question of law, not of fact. *See Westwind Expl., Inc. v. Homestate Svgs. Ass'n*, 696 S.W.2d 378, 381 (Tex.1985); *Tubb v. Bartlett*, 862 S.W.2d 740, 749 (Tex.App.—El Paso 1993, writ denied). In addition to a fact finding, the trial court also made a conclusion of law that the acquisition and development notes, deeds of trust, and other documents between C & I and Leisure "constituted one contract in several phases." We will review the conclusion of law and uphold it if it can be sustained on any legal theory applicable to the case. *See Tubb*, 862 S.W.2d at 749.

In reviewing the record and the parties' briefs, we find no dispute over the fact that, when C & I and Leisure entered into the acquisition loan, they anticipated that a development loan would also be made—which closed in June 1989. The dispute is over whether the acquisition and development loans were two separate contracts or two parts of a single contract. Leisure contends that the loans were a single contract; World Help asserts that each loan was a separate contract. The trial court concluded that all the documents related to the two loans between C & I and Leisure constituted a single contract. We agree.

Texas courts have long applied the rule of statutory construction that "[w]here several instruments, executed contemporaneously or at different times, pertain to the same trans-

---

**5.** This is the amount of the judgment Turner obtained against Leisure in the Turner–Leisure suit.

action, they will be read together although they do not expressly refer to each other." *Board of Ins. Comm'rs v. Great Southern Life Ins. Co.*, 150 Tex. 258, 239 S.W.2d 803, 809 (1951). The court in *Great Southern Life* held that multiple insurance policies, endorsements attached to the policies, a pension trust agreement, and a fully executed commitment letter were all part of the same transaction and should be construed together. *See id.; see also U.S. Life Title Co. v. Andreen*, 644 S.W.2d 185, 189–90 (Tex. App.—San Antonio 1982, writ ref'd n.r.e.) (holding that warranty deed and repurchase agreement formed a single contract); *Estate of Griffin v. Sumner*, 604 S.W.2d 221, 224, 228 (Tex.Civ.App.—San Antonio 1980, writ ref'd n.r.e.) (construing as one contract two warranty deeds dated August 22, 1960 and an option contract executed "shortly thereafter").

In this case, Leisure contends that all of the business dealings between it and C & I had a single purpose: to create a retirement center at Rylee's Landing. World Help agrees that Leisure was created to "develop, own and operate a retirement community on a lake-front site in Granbury, Texas." Further, World Help acknowledges that C & I and Leisure entered into the acquisition loan so that Leisure could purchase Rylee's Landing and into the development loan so that Leisure could develop Rylee's Landing.

The record shows:

• The acquisition loan between C & I and Leisure is evidenced by: (1) a promissory note from Leisure to C & I for $2,579,690; (2) a deed of trust on Rylee's Landing; (3) a warranty deed with vendor's lien on Rylee's Landing; and (4) a loan agreement between C & I and Leisure.

• Leisure used the proceeds from the acquisition loan to acquire Rylee's Landing.

• The development loan between C & I and Leisure consisted of: (1) a promissory note from Leisure to C & I for $4,855,000; (2) a loan agreement between C & I and Leisure; and (3) a deed of trust on Rylee's Landing.

• The proceeds from the development loan were to be used primarily to develop Rylee's Landing. In addition, $254,069 of the proceeds were to be applied towards the principal and interest that had accrued on the acquisition note.

World Help does not argue that the loans were made for any purpose other than to purchase and develop Rylee's Landing. Instead, World Help seems to argue that, because the loan-related documents did not expressly refer to each other or state that the two loans were part of a single transaction, the purchase of Rylee's Landing and the development of a retirement center at Rylee's Landing were two completely separate, independent transactions. As we have previously noted, instruments need not refer to each other to constitute a single transaction. Moreover, this argument does not make sense when applied to this case. If a company such as Leisure is formed solely to "develop, own, and operate" a retirement community, the purchase of real estate, in and of itself, will not accomplish this goal. It is but one step in a two-step process. The property must also be developed. Thus, under the facts of this case, the purchase of Rylee's Landing and the development of the retirement center were interdependent facets of a single transaction.

We hold that the trial court properly concluded that the acquisition and development loans between C & I and Leisure were all part of the same transaction and should be construed as a single contract. We overrule World Help's eleventh point.

## VI. Breach of the Leisure– C & I Contract

In point twelve, World Help challenges the legal and factual sufficiency of the evidence to support the trial court's findings that:

• Leisure was not in default on its obligations to C & I when C & I did not honor its financing commitment for the construction phase (i.e., development loan) and went into bankruptcy; and

• C & I breached its agreement with Leisure when it did not honor the balance of its financing commitment for the construction phase and went into bankruptcy.

Findings of fact entered in a case tried to the court are of the same force and dignity

as a jury's answers to jury questions. *See Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex.1991). The trial court's findings of fact are reviewable for legal and factual sufficiency of the evidence to support them by the same standards that are applied in reviewing evidence supporting a jury's answer. *See Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex.1996).

In determining a "no-evidence" point, we are to consider only the evidence and inferences that tend to support the finding and disregard all evidence and inferences to the contrary. *See Leitch v. Hornsby*, 935 S.W.2d 114, 118 (Tex.1996); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661–62 (1951). If there is more than a scintilla of such evidence to support the finding, the claim is sufficient as a matter of law, and any challenges go merely to the weight to be accorded the evidence. *See Leitch*, 935 S.W.2d at 118.

An assertion that the evidence is "insufficient" to support a fact finding means that the evidence supporting the finding is so weak or the evidence to the contrary is so overwhelming that the answer should be set aside and a new trial ordered. *See Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965). We are required to consider all of the evidence in the case in making this determination. *See Jaffe Aircraft Corp. v. Carr*, 867 S.W.2d 27, 29 (Tex.1993).

### A. Evidence of Leisure's Default

■ World Help contends: Leisure was required to make an interest payment on the development loan promissory note in July 1989 but did not; therefore, Leisure defaulted on the note. C & I's obligation to advance additional funds under the development loan would have been triggered by Leisure's interest payment. Because Leisure did not make the July 1989 interest payment, C & I was never obligated to advance additional funds under the development loan.

The promissory note for the development loan required Leisure to make monthly payments of accrued interest beginning one

month after the date of the note—June 8, 1989. Thus, Leisure's first interest payment on the development loan promissory note was due on July 8, 1989. But Leisure contends that it was not in default on the development loan promissory note, despite the monthly interest payment requirement, because C & I did not follow the provisions in the note governing default.

Regarding default, the promissory note provided:

*Default.* The occurrence of any of the following events shall be considered a default hereunder:

 a. a default in the timely payment of any installment of principal or interest due hereunder;

 . . . .

At the option of the holder of this note, upon the occurrence of any default, the entire principal balance and all accrued, unpaid interest . . . shall at once become due and payable, without presentment, demand, protest, notice or grace.

The failure to exercise the foregoing option upon the happening of one or more of the foregoing defaults shall not constitute a waiver of the right to exercise the same at any subsequent time in respect of the same default or any other default. . . .

 . . . .

*Notice and Opportunity to Cure.* Notwithstanding any other term or condition hereof, the Payee shall give the undersigned (a) ten (10) days, after written notice ("Notice") that an event has occurred that would be a monetary default hereunder . . . to cure same before Payee declares a default hereunder. . . . The Notice shall be sent certified mail, return receipt requested, to the undersigned at its address herein provided. . . . *No default shall be deemed to have occurred unless the Notice is given* and the matter referred to in the Notice remains unremedied at the end of the applicable period for cure. . . . [Emphasis added.][6]

World Help does not contend that C & I— the Payee on the note—gave Leisure notice that Leisure was in default under the promis-

---

**6.** The promissory note for the acquisition loan also contained these provisions.

sory note, nor does World Help direct us to any evidence that the required notice was ever given. Accordingly, the evidence is legally and factually sufficient to support the trial court's finding that Leisure was not in default on its obligations to C & I when C & I failed to honor its financing commitment for the construction phase and went into bankruptcy.

### B. Evidence of C & I's Breach

▪ The loan agreement for the development loan provided that Leisure, as borrower, had to satisfy certain conditions precedent before C & I would advance loan proceeds: Leisure could not be in default, and it was required to make "draw requests" "in form and content approved by [C & I], accompanied by such lien waivers and releases as [C & I] may require...." The loan agreement does not specify what constituted "form and content approved by C & I."

Although C & I could "postpone the performance of any condition to any advance," C & I's advancement of loan proceeds without requiring performance of the conditions precedent did not waive the conditions or prevent C & I from later declaring a default.

The record shows that C & I funded between $400,000 and $433,000 [7] of the development loan between June 8 and July 18, 1989. On September 25, 1989, Leisure—through Sanders—requested an additional $167,237. Leisure made this draw request using a form approved and provided by AMI. C & I never requested any additional information from Leisure regarding the draw request.

Willard May told Sanders that the request could not be funded because another borrower had defaulted on several million dollars' worth of promissory notes. May stated that C & I was expecting a large payment on the defaulting borrower's notes and would fund Leisure's request as soon as that payment was made. No one from C & I ever told Sanders that Leisure's failure to perform under the development loan agreement or

promissory note was the reason C & I did not fund the draw request.

The July 1989 advance was the last advance that C & I made under the development loan. C & I never funded Leisure's September 1989 draw request for $167,237. Instead, it filed bankruptcy in October 1989. C & I's bankruptcy estate never funded the draw request, either.

This evidence shows that, although Leisure satisfied the conditions precedent to advancement of development loan proceeds, C & I did not make any advances after July 1989. Further, C & I's reason for not advancing loan proceeds was unrelated to Leisure's performance of its obligations to C & I. We hold the evidence is legally and factually sufficient to support the trial court's finding that C & I breached its agreement with Leisure when it did not honor the balance of its financing commitment for the construction phase and went into bankruptcy. We overrule point twelve.

### VII. World Help's Claims Against Leisure

In three cross points, Leisure contends that the trial court erred by:

- rendering judgment for World Help against Leisure on the promissory notes;
- awarding World Help any rights in the rental proceeds from Rylee's Landing; and
- rendering judgment for World Help against Leisure based on World Help's payment of the 1993 ad valorem taxes due on Rylee's Landing.

Leisure admits that the deeds of trust gave C & I a lien against the rental proceeds from Rylee's Landing and the right to pay delinquent ad valorem taxes and add the amount to the mortgage debt. But Leisure contends that C & I would not be entitled to recover anything under the promissory notes or deeds of trust because C & I breached the parties' agreement by not funding the development loan. Leisure further contends that World Help merely stands in C & I's shoes

---

7. The summary judgment evidence shows that C & I advanced just under $403,000, while evidence presented at trial indicates this figure may have been closer to $433,000.

and is therefore subject to all of Leisure's defenses against C & I.

■ We have upheld the trial court's finding of fact that C & I breached the parties' agreement because it failed to fund Leisure's draw request even though C & I had not given Leisure written notice that it was in default on the development loan promissory note. But our holding with regard to that finding does not preclude *World Help* from enforcing the promissory notes and deeds of trust against Leisure.

The promissory notes each contained a section governing default in general (the default provision) and a section governing notice of default (the notice provision).[8] The notice provision expressly required the *Payee* of the notes to give Leisure written notice of default and an opportunity to cure before Leisure would be in default on the notes. The notes named C & I, alone, as the Payee. However, the notes did not require any *holder* of the notes except the Payee to perform the notice provision. Thus, under the express terms of the promissory notes, only C & I was a Payee, and only C & I could be bound by the notice provision's requirements.

The default provision did not require written notice and an opportunity to cure before Leisure would be in default on the notes. Instead, the default provision allowed the *holder* of the notes to enforce full payment from Leisure at any time after Leisure failed to make a timely interest or principal payment. Thus, C & I and Leisure agreed that C & I, as Payee, had to give Leisure written notice of default and an opportunity to cure before Leisure would be in default on the notes as to C & I, but that no such notice would be required from subsequent holders of the notes.

The Texas version of the Uniform Commercial Code (the UCC) provides that the transferee of an instrument (e.g., World Help) ordinarily acquires the same rights to enforce payment of the instrument that the transferor (C & I) had. *See* TEX. BUS. & COM.CODE ANN. § 3.203(b) (Vernon Supp.

1998); *Siegler v. Ginther*, 680 S.W.2d 886, 890 (Tex.App.—Houston [1st Dist.] 1984, no writ). Thus, at issue is whether C & I and Leisure could vary a transferee's rights by agreement, thereby giving subsequent holders of the promissory notes greater enforcement rights than C & I had.

The UCC provides that its effect may indeed be varied by agreement. *See* TEX. BUS. & COM.CODE ANN. § 1.102(c), (d) (Vernon 1994); *Gasmark, Ltd. v. Kimball Energy Corp.*, 868 S.W.2d 925, 928 (Tex.App.—Fort Worth 1994, no writ); *see also* TEX. BUS. & COM.CODE ANN. § 1.102 cmt. 2 ("But an agreement can change the legal consequences which would otherwise flow from the provisions of the Act."); *Jon–T Chems., Inc. v. Freeport Chem. Co.*, 704 F.2d 1412, 1416 (5th Cir.1983).

Because the UCC's effect may be varied by agreement, we hold that C & I and Leisure could and did contract that subsequent holders of the promissory notes would not be held to performance of the notice provision's written notice and cure requirements. The effect of this agreement is that C & I was required to give Leisure notice and an opportunity to cure before enforcing payment on the promissory notes, but World Help was not.

■ Our holding is also dispositive of Leisure's breach of contract defense. The purchaser of a note who knew at the time of purchase that the notes were overdue does not qualify as a holder in due course.[9] *See* TEX. BUS. & COM.CODE ANN. § 3.302(a)(2)(C) (Vernon Supp.1998); *Bailey, Vaught, Robertson and Co. v. Remington Inv., Inc.*, 888 S.W.2d 860, 868 (Tex.App.—Dallas 1994, no writ); *Lynd v. Wesley*, 705 S.W.2d 759, 763 (Tex.App.—Houston [14th Dist.] 1986, no writ). But the purchaser may still recover on the indebtedness, subject to any claims or defenses available to the obligor. *See* TEX. BUS. & COM.CODE ANN. § 3.305(a) (Vernon Supp.1998); *Lynd*, 705 S.W.2d at 763. The obligor's defenses include those that are

8. *See* supra pp. 677–678 for the pertinent language of these provisions.

9. A holder in due course takes an instrument free from most of the obligor's claims and defenses.

*See* TEX. BUS. & COM.CODE ANN. §§ 3.305(b), 3.306 (Vernon Supp.1998).

available at common law against enforcement of a contract. *See* TEX. BUS. & COM.CODE ANN. § 3.305(a)(2).

Under Texas common law, a person who has breached a contract cannot recover on it. *See D.E.W., Inc. v. Depco Forms, Inc.,* 827 S.W.2d 379, 382 (Tex.App.—San Antonio 1992, no writ); *Dallas Mkt. Ctr. v. The Swing, Inc.,* 775 S.W.2d 838, 842 (Tex.App.—Dallas 1989, no writ); *Joseph v. PPG Indus., Inc.,* 674 S.W.2d 862, 867 (Tex.App.—Austin 1984, writ ref'd n.r.e.). C & I breached the parties' agreement because it did not fund Leisure's draw request at a time when Leisure was not formally in default on the promissory notes. Therefore, C & I would not be able to enforce payment of the promissory notes against Leisure. However, the promissory notes expressly provided that the notice provision was only enforceable against C & I; subsequent holders of the notes were not bound by it. Consequently, Leisure could assert the no notice defense against C & I but it could not assert that defense against World Help.

Because C & I and Leisure contracted to transfer to subsequent holders of the notes greater enforcement rights than C & I had, and because Leisure could not assert the no notice defense against World Help, we hold that World Help could recover from Leisure on the promissory notes and deeds of trust.

■ Leisure seems to argue that it was never in default on the loans because it agreed with C & I that part of the development loan proceeds—those allocated to "contingency" and "working capital"—would be applied towards interim interest payments on the notes. Thus, it was C & I's failure to fund the loan as agreed that caused Leisure to be unable to make the interest payments. Leisure asserts that parol evidence was admissible to explain the intended use of the "contingency" and "working capital" listed in the parties' writings. World Help contends that this evidence, which the trial court excluded, was inadmissible because it pertained to an alleged ambiguity in the agreement, and Leisure did not plead ambiguity.

■ Ambiguity is an affirmative defense, and a person seeking to establish ambiguity in a written contract must specifically plead it at the trial court level. *See Gulf & Basco Co. v. Buchanan,* 707 S.W.2d 655, 656 (Tex.App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.); *Covered Bridge Condo. Ass'n v. Chambliss,* 705 S.W.2d 211, 214 (Tex.App.—Houston [14th Dist.] 1985, writ ref'd n.r.e.). The pleading must set out the alleged ambiguous portion of the contract and the meaning or construction relied on by the party asserting ambiguity. *See Gulf & Basco Co.,* 707 S.W.2d at 656.

Leisure contends that the parol evidence was not offered to resolve an ambiguity but to define undefined terms and thus complete the contract.[10] Leisure urges that the evidence was therefore admissible under the parol evidence rule. This argument begs the question.

The parol evidence rule is a rule of substantive law; it is not a rule of pleading. *See Maranatha Temple, Inc. v. Enterprise Prods. Co.,* 893 S.W.2d 92, 101 (Tex.App.—Houston [1st Dist.] 1994, writ denied); *Southwest Airlines Co. v. Jaeger,* 867 S.W.2d 824, 831 (Tex.App.—El Paso 1993, writ denied). The question at issue is whether Leisure had to raise in its pleadings the need for parol evidence before offering such evidence at trial.

The Texas Rules of Civil Procedure require a party to affirmatively plead matters constituting an avoidance or an affirmative defense. *See* TEX.R. CIV. P. 94. Leisure contends that it did not breach its agreement with C & I because the terms "contingency" and "working capital" in the parties' writings "were provisions for interim interest" on Leisure's loans from C & I. Regardless of whether these terms are characterized as incomplete or ambiguous without the proffered parol evidence, Leisure's contention is a matter of avoidance, and Leisure was required to plead it in the trial court. Because Leisure did not raise the issue in its pleadings, the trial court properly excluded evidence of the terms' alleged meanings, and we

---

10. Leisure makes this argument in its reply brief, but in its appellee's brief Leisure asserts that "contingency" and "working capital" are ambiguous terms.

will not consider it on appeal. We overrule Leisure's cross points.

## VIII. Leisure's Offset

■ In point ten, World Help contends that the trial court erred in granting Leisure an offset against World Help's damages award from Leisure. World Help does not cite any legal authority to support this argument, nor does it brief this complaint other than to challenge the trial court's findings of fact and conclusion of law addressed in points eleven and twelve. Because World Help has not briefed this issue, we will not address it. *See* TEX.R. APP. P. 38.1(h); *Happy Harbor Meth. Home, Inc. v. Cowins*, 903 S.W.2d 884, 886 (Tex.App.—Houston [1st Dist.] 1995, no writ) (holding that failure to cite authority to support contention on appeal waives contention); *Metzger v. Sebek*, 892 S.W.2d 20, 45 (Tex.App.—Houston [1st Dist.] 1994, writ denied) (same), *cert. denied*, 516 U.S. 868, 116 S.Ct. 186, 133 L.Ed.2d 124 (1995). We overrule point ten.

## IX. World Help's Security Interest in the Rental Proceeds

In its fourth point, World Help asserts that the trial court improperly failed to render judgment that World Help had a security interest in the rental proceeds from Rylee's Landing and that the security interest took priority over Turner's and Kingdom's liens. The trial court's judgment limits World Help's right to rental proceeds to the amount needed to satisfy its claim for the 1993 ad valorem taxes.

The deeds of trust for the acquisition and development loans granted C & I a security interest in the rental proceeds from Rylee's Landing. In light of our holding that World Help may enforce the promissory notes and deeds of trust against Leisure, we also hold that World Help has a security interest in all of the rental proceeds from Rylee's Landing, even after its claim for the 1993 ad valorem taxes is satisfied. We hold that the security interest has the same priority as World Help's mortgage liens because the security interest was granted in the loan documents. We sustain point four in part and overrule it in part.

## X. Equitable Subrogation

■ In point seven, World Help contends that the trial court improperly denied its motion for summary judgment that it was equitably subrogated to HCAD's tax liens on Rylee's Landing based on World Help's payment of delinquent ad valorem taxes for 1989 through 1992.

World Help purchased the Leisure documents in December 1992. At that time, ad valorem taxes of $218,031 were past due on Rylee's Landing for the years 1989 through 1992. In January 1994, World Help paid the delinquent property taxes and 1993 property taxes of $34,860.

In conclusions of law 4 and 6, the trial court concluded that:

- World Help is deemed to have accounted for the delinquent ad valorem taxes in the price it paid to purchase the Leisure documents because World Help was charged with notice of the delinquent taxes at the time of purchase; and

- World Help has a first priority lien against Rylee's Landing for $34,860—the amount of the 1993 ad valorem taxes that accrued after World Help purchased the Leisure documents.

World Help contends that the deed of trust on the acquisition loan allowed it to pay the delinquent ad valorem taxes and add the tax amount to the mortgage amount. World Help further contends that it is entitled to be equitably subrogated to HCAD's tax liens on Rylee's Landing.

When equitable subrogation is an issue, a case is usually controlled by its facts. *See Providence Inst. for Sav. v. Sims*, 441 S.W.2d 516, 519 (Tex.1969); *Farm Credit Bank*, 886 S.W.2d at 310. The purpose of the doctrine is to prevent the unjust enrichment of the debtor who owed the debt that is paid. *See First Nat'l Bank v. O'Dell*, 856 S.W.2d 410, 415 (Tex.1993); *Farm Credit Bank*, 886 S.W.2d at 310.

■ Subrogation to the creditor's rights is available only when the debtor was enriched unjustly; thus, the payor who confers a benefit as a "mere volunteer" is not

entitled to this remedy. *Smart v. Tower Land and Inv. Co.*, 597 S.W.2d 333, 337 (Tex.1980). A mortgagee who pays taxes that its mortgagor is under a duty to pay is not a volunteer because of the mortgagee's interest in the security of the mortgage. *See id.* at 338. The mortgagee may be subrogated to the taxing authority's lien to the extent necessary for its own equitable protection. However, "[w]hen not compelled by the equities of the situation, full subrogation to all special privileges accompanying the taxing authority's . . . lien will be denied." *Id.*

In the *Smart* case, the mortgagee, Tower Land and Investment Company (Tower), purchased property at a foreclosure sale. After the sale, Tower paid the delinquent ad valorem taxes that had been assessed against the property while the mortgagor, Smart, owned it and then sought to recover them from Smart. *See id.* at 338. The Texas Supreme Court held that the equities of the suit did not entitle Tower to be subrogated to the taxing authority's lien. The court reasoned that Tower could have accounted for the delinquent taxes in determining its bid amount; thus, Tower was considered to have purchased the property with reference to the tax liability. *See id.* at 339.

In this case, the trial court also determined that the equities of the situation did not entitle World Help to be fully subrogated to HCAD's liens on Rylee's Landing.

Jimmy Neal Thomas, one of World Help's directors, testified that he knew at the time of purchase that the Leisure notes were in "substantial and material default" and that Rylee's Landing might be subject to liens for unpaid property taxes. Thomas testified that World Help did no investigation regarding the unpaid taxes, the loans, or any other aspect of Rylee's Landing.

In light of World Help's knowledge at the time it purchased the Leisure documents, we cannot say that the equities of the situation entitle World Help to be subrogated to HCAD's liens for the 1989 through 1992 taxes. Because World Help knew of the likelihood of the tax liens, it could have ascertained the amount of the delinquent taxes

and accounted for that amount in its bid for the Leisure documents.

■■■ World Help contends that to deny it a first priority lien on the entire amount of the paid ad valorem taxes would be to grant Turner and Kingdom a windfall. Whether Turner or Kingdom benefitted by World Help's payment of the taxes is irrelevant to the equitable subrogation issue. Rather, the inquiry is whether the *debtor* would be un-justly enriched if subrogation does not occur. *See First Nat'l Bank*, 856 S.W.2d at 415. World Help does not contend that Leisure would be unjustly enriched by the trial court's decision as to lien priorities.[11]

World Help's bid amount would not have accounted for taxes due for 1993, because World Help purchased the Leisure documents in 1992—before the 1993 taxes were due. Thus, the trial court's ruling that World Help is equitably subrogated to HCAD's lien for the 1993 taxes is proper under the circumstances of this case.

We overrule World Help's seventh point.

## XI. World Help's Recovery of the Delinquent Tax Amount

■■■ In point eight, World Help contends the trial court erroneously refused to render judgment for World Help against Leisure based on World Help's payment of the 1989 through 1992 ad valorem taxes. In conclusion of law 4, the trial court concluded that World Help has no valid claim against Leisure for the delinquent taxes.

Although World Help was not entitled to be equitably subrogated to HCAD's tax liens on Rylee's Landing, it does not follow that World Help could not recover from Leisure for payment of the delinquent taxes. Whether Leisure was liable for nonpayment of the ad valorem taxes is a separate question from what lien priority World Help should receive based on its payment of the taxes.

The deed of trust that secured the acquisition loan promissory note allowed C & I, as mortgagee, to pay delinquent property taxes and add the amount of the taxes to the

---

11. World Help does contend that Leisure was unjustly enriched by World Help's *payment* of the

delinquent taxes. We address that argument in our discussion of World Help's eighth point.

mortgage debt. Leisure acknowledges that the deed of trust gave the mortgagee of Rylee's Landing this right.

Many Texas cases have held that if a mortgagor fails to pay taxes he has promised to pay, the mortgagee may treat the amount owed for taxes as part of the mortgage debt. . . . If the mortgagor fails to pay the taxes, the mortgagee may pay them and the amount paid for taxes is considered to be a part of the mortgage debt. Both the mortgagor's obligation to pay the amount due on the purchase price and his obligation to pay taxes are secured by the mortgage.

*Smart,* 597 S.W.2d at 336.

As successor mortgagee, World Help was permitted to pay the delinquent ad valorem taxes on Rylee's Landing and add that amount to the mortgage debt. World Help paid the taxes. Accordingly, World Help was entitled to recover the delinquent tax amount from Leisure, and the trial court erred by concluding otherwise. We sustain World Help's eighth point.

### XII. World Help's Lien Priority for the Paid Taxes

In point six, World Help contends that the trial court erred in granting Turner and Kingdom summary judgment subordinating World Help's liens for the paid ad valorem taxes to Turner's and Kingdom's liens. In its summary judgment order, the trial court ruled that World Help's "legal or equitable liens" are superior to Turner's and Kingdom's liens to the extent of $34,860 (the amount of the 1993 ad valorem taxes). The trial court ruled that Turner's and Kingdom's liens are superior to all of World Help's other liens.

In our discussion under point seven, we upheld the trial court's ruling that World Help is not entitled to be equitably subrogated to HCAD's first priority lien for the delinquent property taxes on Rylee's Landing. *See* op. at 681–682. But we ruled in point eight that World Help was permitted to pay delinquent taxes and add that amount to the acquisition mortgage debt. *See id.* at 682. Because World Help's payment of the delinquent ad valorem taxes is secured by the

deed of trust on the acquisition loan, World Help's lien priority on the now-paid delinquent taxes is the same as its mortgage lien priority. However, what that priority is must be determined on remand after a trial on the merits of the equitable subordination issue. We sustain point six.

### XIII. World Help's Attorney's Fees

■ In its fifth point, World Help complains that the trial court improperly failed to award it attorney's fees against Leisure. World Help asserts that it is entitled to attorney's fees because it won a portion of its breach of contract claim against Leisure. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 38.001(8) (Vernon 1997).

■ When a prevailing party in a breach of contract suit seeks attorney's fees, an award of reasonable fees is mandatory under section 38.001 if there is proof of the reasonableness of the fees. *See Atlantic Richfield Co. v. Long Trusts,* 860 S.W.2d 439, 449 (Tex.App.—Texarkana 1993, writ denied); *Budd v. Gay,* 846 S.W.2d 521, 524 (Tex. App.—Houston [14th Dist.] 1993, no writ.). A trial court has discretion to fix the amount of attorney's fees, but it does not have the discretion to completely deny attorney's fees if they are proper under section 38.001. *See Budd,* 846 S.W.2d at 524.

William Korb, World Help's attorney, testified at trial about the reasonableness of his firm's attorney's fees. Korb listed the work he had performed in preparation and trial of the case. He testified that he had expended 300 hours on the case at $150 per hour; that two paralegals had expended a total of 233 hours at $55 per hour; and that other attorneys in his firm had worked a total of 18 hours on the case at $120 per hour. The total of these amounts is $59,975. Korb also testified that the services provided and the hourly rates were reasonable based on the issues involved in the case. Finally, Korb testified that $20,000 was a reasonable legal fee to charge if the case was appealed to this court; $5,000 would be a reasonable fee for filing an application for writ of error with the Texas Supreme Court; and $5,000 would be

a reasonable fee if the supreme court granted the application.

Korb's testimony was uncontroverted. On cross-examination, Leisure only asked whether World Help had actually been charged the fees about which Korb testified, or whether the case was being tried on a contingency fee basis. Korb responded that World Help was regularly paying legal fees on an hourly rate basis and had "been charged $60,000 for the trial of the case." Kingdom asked whether the fees had been paid, and Korb testified that all fees had been paid except for those billed during January 1996—the month in which the case was tried. Turner's attorney merely questioned Korb about whether $35,000 was a reasonable amount of attorney's fees for trying *Turner's* claims in the case. No other evidence was offered regarding the amount or reasonableness of World Help's attorney's fees.

■ What amount of attorney's fees is reasonable is a question of fact. *See International Sec. Life Ins. Co. v. Spray,* 468 S.W.2d 347, 349 (Tex.1971). But where, as here, trial counsel's testimony concerning attorney's fees for the trial of a case is clear, positive and direct, and uncontroverted, it is taken as true as a matter of law. This is especially true where the opposing party had the means and opportunity to disprove the testimony, if it were not true, and failed to do so. *See Ragsdale v. Progressive Voters League,* 801 S.W.2d 880, 882 (Tex.1990); *Clary Corp. v. Smith,* 949 S.W.2d 452, 469 (Tex.App.—Fort Worth 1997, pet. denied); *see also* TEX. CIV. PRAC. & REM.CODE ANN. § 38.003 (Vernon 1997) (stating rebuttable presumption that usual and customary attorney's fees are reasonable). Because none of the appellees questioned or controverted Korb's testimony, even though they had the means and opportunity to do so, we hold that the testimony established World Help's legal fees through trial of the case as a matter of law.

■ World Help also contends that it is entitled to attorney's fees against Turner and Kingdom with regard to the lien priorities issue. Whether World Help is entitled to those attorney's fees is undecided because we are remanding the lien priorities issue for trial on the merits. Ordinarily, a party is required to segregate fees incurred on claims allowing the recovery of fees from those that do not. *See Stewart Title Guar. Co. v. Aiello,* 941 S.W.2d 68, 73 (Tex.1997). But when the claims are dependent upon the same set of facts or circumstances and thus are intertwined to the point of being inseparable, the party suing for attorney's fees may recover the entire amount covering all claims. *See id.* Leisure does not contend that the attorney's fee award should be segregated, and we believe the issues are so intertwined that segregation would be impracticable. Accordingly, we hold that World Help may recover the full $60,000 in attorney's fees from Leisure. However, the trial court should decide on remand whether World Help is entitled to recover attorney's fees from Turner and Kingdom concerning the lien priorities issue. If the trial court decides that an award of attorney's fees against Turner and Kingdom is proper, then Leisure, Turner, and Kingdom will be jointly and severally liable for the $60,000 attorney's fee award.

The award of appellate attorney's fees is also a question for the fact finder. *See id.* We may not initiate an award of appellate fees, since that would be an exercise of original rather than appellate jurisdiction. *See International Sec. Life Ins. Co.,* 468 S.W.2d at 349. Korb's testimony as to appellate attorney's fees did not establish the reasonableness of the requested amounts as a matter of law. Accordingly, we will remand this portion of the attorney's fees issue to the trial court for a determination and an award.

We sustain World Help's fifth point as it pertains to World Help's attorney's fees claim against Leisure and decline to rule on the point as it pertains to World Help's claim against Turner and Kingdom.

## XIV. Turner's Attorney's Fees

In its sole cross point, Turner asserts that the trial court erred in failing to award Turner attorney's fees.

■ Turner contends it is entitled to recover attorney's fees from both World Help and Leisure under section 38.001 of the Texas Civil Practice and Remedies Code. We

·disagree. To be entitled to attorney's fees under section 38.001, Turner was required to prevail on at least a portion of its claims. *See Atlantic Richfield Co.*, 860 S.W.2d at 449. The final judgment in this case does not award Turner any relief against Leisure because Turner did not sue Leisure in this case.

Turner's only claim against World Help within the scope of section 38.001 was derivative of C & I's alleged breach of the June 1989 letter agreement. Turner did not prevail on its claim that C & I breached the letter agreement. In its findings of fact, the trial court found that C & I breached its "set-aside agreement" with Turner but did not find that the breach caused Turner any damages. Because Turner did not prevail on any claims under section 38.001, it is not entitled to attorney's fees based on that statute.

 Turner also contends that it is entitled to recover attorney's fees from World Help under section 53.156 of the Texas Property Code because it prevailed against World Help on the lien priorities issue, which is covered by the statute. Section 53.156 provides:

> In any proceeding to foreclose a lien ... or in any proceeding to declare that any lien or claim is invalid or unenforceable in whole or in part, the court *may* award costs and reasonable attorney's fees as are equitable and just.

TEX. PROP.CODE ANN. § 53.156 (Vernon 1995) (emphasis supplied).

This language indicates that a trial court's award of attorney's fees under this statute is discretionary, not mandatory. *See id.; see also Texas Constr. Assocs. v. Balli*, 558 S.W.2d 513, 522 (Tex.Civ.App.—Corpus Christi 1977, no writ) (holding that trial court's award of attorney's fees under predecessor statute was discretionary, not mandatory). Thus, an award of attorney's fees under section 53.156 is not automatic, even to a prevailing party.

Moreover, in light of our holding that the summary judgment on lien priorities is improper, Turner is not a prevailing party on the lien priority issue. Accordingly, without

deciding whether Turner's claims below fell within the purview of section 53.156, we hold that Turner is not, at this point, entitled to attorney's fees under section 53.156. We overrule Turner's cross point.

## XV. Conclusion

We affirm the trial court's judgment in part, reverse and remand in part, and reverse and render in part as follows:

- We reverse the trial court's judgment that Turner's and Kingdom's liens are superior to World Help's mortgage liens and remand the lien priorities issue for trial on the merits.

- We reverse the trial court's judgment granting Turner an equitable lien on the rental proceeds from Rylee's Landing and render judgment that Turner does not have an equitable lien on the rental proceeds.

- We affirm the trial court's judgment that the acquisition and development loans comprised a single contract, which C & I breached but Leisure did not.

- We reverse the trial court's judgment denying World Help recovery from Leisure for the $218,031 in paid delinquent property taxes and render judgment that World Help recover that additional amount from Leisure as part of the mortgage debt. We reform the trial court's judgment awarding World Help damages from Leisure on the promissory notes to reflect the additional $218,031, or $2,319,968 in total damages and affirm the damages award as reformed. We remand to the trial court for recalculation of interest on the reformed damages award.

- We reverse the trial court's judgment denying World Help's claim to the rental proceeds from Rylee's Landing and render judgment that World Help has a security interest in the rental proceeds, which has the same priority as World Help's mortgage liens because it was granted in the acquisition and development loan documents.

- We affirm the trial court's judgment that World Help has a first priority lien against

Rylee's Landing for $34,860—the amount of the 1993 ad valorem taxes.

• We affirm the trial court's judgment that World Help is not equitably subrogated to HCAD's tax liens for the 1989 through 1992 ad valorem taxes. We render judgment that World Help's lien priority with respect to the delinquent tax amount ($218,031) has the same priority as its mortgage liens because the paid delinquent taxes are now part of the mortgage debt.

• We reverse the trial court's judgment denying World Help's claim for attorney's fees against Leisure and render judgment that World Help recover $60,000 in attorney's fees from Leisure for trial of the underlying case. We remand to the trial court the issue of what is a reasonable amount of appellate attorney's fees. We also remand the issue of whether World Help can recover attorney's fees from Turner and Kingdom related to the lien priorities issue, in which case Leisure, Turner, and Kingdom would be jointly and severally liable for the attorney's fee award.

• We affirm the trial court's judgment denying Turner's claim for attorney's fees.