**FIRST NATIONAL BANK OF KERR-VILLE and William Michael Childer, Petitioner,**

v.

**David Melton O'DELL, Respondent.**

**No. D–1574.**

Supreme Court of Texas.

June 23, 1993.

Frank Oliver, Austin, William Michael Childers, Kerrville, Marc O. Knisely, Austin, for petitioner.

Jerry T. Steed, San Antonio, for respondent.

## OPINION

GAMMAGE, Justice.

This summary judgment case involves a real estate lien priority dispute, and presents the issue of proper application of the doctrine of equitable subrogation. The First National Bank of Kerrville ("Bank"), as the fourth lienholder, purported to buy the first and second lienholder notes and renew, extend and rearrange such notes to exclude the notice required to the third lienholder, Dr. David Melton O'Dell and his wife Carolyn (collectively "O'Dell"), who were the only parties involved personally liable under the notes.

When the "makers" defaulted, the Bank foreclosed without giving any notice to O'Dell. The Bank argues that under the equitable subrogation doctrine its foreclosure cut off O'Dell's third lien. We disagree. We hold that the equitable subrogation doctrine does not apply to the notice provisions of a renewal and extension of a prior lien unless at least *one* of the makers of the renewal note is personally liable on the original note. For procedural reasons we reverse the judgment of the court of appeals, 855 S.W.2d 1 and remand the cause to the trial court.

The facts underlying the suit are not simple. They begin in August of 1981, with a transfer by general warranty deed from Charlie C. Davis III and others to Roland Walters of 190.338 acres in Bandera County. As part of the purchase price, Walters executed a promissory note in the original principal amount of $121,626 to Davis. The note was secured by a vendor's lien and first lien deed of trust on the 190 acres. We refer to this note as the Davis first lien note.

The Davis first lien note provided that obligors on it receive *fifteen days' written notice* before acceleration of maturity. Further, the note *did not provide for waiver of notice* of default, dishonor, demand, presentment, intent to accelerate and acceleration. The note required extensive notice to obligors before any foreclosure proceeding could commence. The deed of trust securing the Davis first lien note did not set forth the fifteen-day notice requirement.

In August of 1982, a year later, Walters sold the 190 acres to O'Dell and his wife. O'Dell executed a $111,547 promissory note to Walters as part of the purchase price. The note was secured by a second lien deed of trust on the 190 acres. O'Dell was personally liable as a maker of this Walters second lien note. He also expressly assumed the obligation to pay the Davis first lien note as part of the consideration for the conveyance.

The Walters second lien note did not provide for waiver of notice of intent to

accelerate. The assumption of the Davis first lien note was of record.

Later that year, in December 1982, O'Dell purchased from Fred A. Hannah and wife an adjacent tract of approximately 47.35 acres. Hannah conveyed the property by general warranty deed, and a vendor's lien was reserved as to the 47 acres to secure O'Dell's payment of a $50,000 note to purchase the property. O'Dell combined the 47 acres with the 190 acres to form a ranch of some 237.68 acres.

Less than two years later, in July 1984, O'Dell sold the 237.68 tract to the 237–Acre Bandera Ranch Partnership, by general warranty deed. As consideration O'Dell received $150,000 in cash plus a $191,303 promissory note secured by a third lien deed of trust on the 237 acres. The partnership was the maker of the third lien note, but the note itself was a "non-recourse" note. It provided that neither the partnership nor any partners would ever be liable for such note, and that O'Dell as payee agreed to look exclusively to foreclosure on the collateral (the 237 acres) for satisfaction of the debt. The partnership expressly did not assume the payment of either the Davis first lien note or the Walters second lien note. Rather, the partnership took the property "subject to" the first and second lien notes and liens securing them. Thus, at this point, neither the partnership nor any partner was personally liable for *any* note or indebtedness secured by the property. O'Dell remained solely personally liable on the Davis and Walters notes.

There was summary judgment evidence that O'Dell agreed not to object to the Bandera Ranch Partnership's paying the Davis first and Walters second lien notes directly to their holders. This payment would be necessary, of course, to prevent default and foreclosure on the property owned "non-recourse" by the partnership. But O'Dell was still the only obligor and was contractually entitled to notice if the partnership failed to make payments on either note.

Two years after the transaction, in July 1986, the Bank loaned $570,000 to the partnership. The partnership and a related corporation were liable on the note. The $570,000 loan's proceeds were used for a number of purposes. The Bank purchased the Davis and Walters notes and liens by paying the outstanding principal balances on the notes, about $189,000.[1] Part of the proceeds went to purchase the interest of a former partner. Finally, $167,000 of the proceeds went to fund a reserve account for the partnership.

The partnership executed the $570,000 note payable to the Bank and a deed of trust on the entire 237 acres to secure payment of the note. The Davis and Walters notes were endorsed to the Bank, and Davis and Walters executed written assignments of the liens securing the their respective notes to the Bank. The $570,000 deed of trust expressly recites that the $570,000 note was given in part in renewal and extension of the Davis and Walters notes and further recites that the liens securing the Davis and Walters notes are "valid and subsisting liens against the property" and are renewed, extended, and continued in full force and effect.[2] The

1. The court of appeals opinion operates on the assumption that because the Bank officer's affidavit states the Bank "paid off" the first and second lien notes, the Bank is estopped to deny paying off the notes to extinguish them. Reading the affidavit in context, we are persuaded that it means the Bank paid the amounts outstanding on the notes to purchase them. The faces of the documents themselves show each of the Davis and Walters transactions to be a transfer of note and lien.

2. After fully describing the first and second lien notes, the deed of trust stated:

The hereinabove described liens are hereby expressly acknowledged by Grantors as valid and subsisting liens against the property herein described, (which said notes, together with the liens securing same, have been duly assigned and transferred to FIRST NATIONAL BANK OF KERRVILLE), and it is expressly agreed that said liens are hereby renewed, extended and continued in full force and effect to secure the payment of the Note hereby secured.

The note hereby secured further represents and is given for the sum of $380,911.05, this date advanced and paid in cash by FIRST NATIONAL BANK OF KERRVILLE to the Grantors herein at their special instance and request, the receipt of which is hereby acknowledged by them.

$570,000 note contained a provision purportedly waiving all notices that O'Dell had expressly reserved the right to receive in the Davis first lien note and the Walters second lien note. O'Dell did not participate in or otherwise consent to any part of this transaction. Thus the Bank purported to have the partnership and a corporate non-owner—parties who were not even liable [3] on the two notes—renew, extend, and modify the notice provisions of the notes to the detriment of the only parties actually obligated thereon (O'Dell).

The Bandera Ranch Partnership defaulted on the $570,000 note. The Bank posted the whole 237 acres for foreclosure and had the sale in August 1987. The Bank did not give O'Dell any notice that the note was claimed to be in default. The Bank further gave O'Dell no notice of the foreclosure sale, other than the posted public notice at the courthouse, even though O'Dell constituted the maker of the second lien note, and had expressly assumed the first lien note. The Bank took it upon itself to make the legal determination that O'Dell was not obligated under any part of the indebtedness evidenced by the $570,000 note, and consequently not entitled to certified mail notice under section 51.002 of the Texas Property Code.

The Bank was the successful bidder at the sale, purchasing the property for $195,000 as a credit against the $570,000 note. The day after its foreclosure, the Bank gave written notice to O'Dell asserting that the foreclosure had extinguished the rights of O'Dell in the whole 237 acres, including any rights to a security interest under the O'Dell note and deed of trust.

In November 1987, O'Dell foreclosed under his third lien deed of trust. O'Dell was

---

An earlier provision in the deed of trust made clear that the Bank was claiming a first lien as to the $189,000 as a renewal and extension of the Davis and Walters notes but fourth lien as to the $380,000 remainder. Further, the Bank treated separately the two tracts by claiming first lien rights only as to the 190 acres, excepting to O'Dell the first lien on the 47 acres. The deed of trust provides (emphasis added):

Insofar as that certain 190.338 acre portion of the herein described 237.68 acre tract is concerned, which 190.338 acre tract is more fully described in a Deed from Roland Walters to David Melton O'Dell, M.D. and wife, Carolyn Lee O'Dell, dated August 27, 1982, recorded in volume 216, Page 63, of the Deed Records of Bandera County, Texas, *the liens securing the payment of $380,911.05 of this $570,000 note shall be and remain secondary and inferior to the liens securing the payment of that one certain promissory note in the original principal sum of $191,303.14, dated July 21, 1984, executed by 237–Acre Bandera Ranch Partnership and payable to the order of David Melton O'Dell, M.D. and wife, Carolyn Lee O'Dell,* more fully described in and secured by a Vendor's Lien retained in Deed of even date therewith executed by David Melton O'Dell, M.D. and wife, Carolyn Lee O'Dell, to 237–Acre Bandera Ranch Partnership and duly recorded in Volume 247, Page 716, Real Property Records of Bandera County, Texas, and being additionally secured by a Deed of Trust of even date therewith duly recorded in Volume 247, Page 725, Real Property Records of Bandera County, Texas. Insofar as that certain 50.82 acre tract is concerned, which 50.82 acre tract is more fully described in that Deed from Fred A. Hannah, Jr., et ux, to David Melton O'Dell, Sr., et ux, dated December 27, 1982, recorded in Volume 218, Page 463, Deed Records of Bandera County, Texas, *the liens securing the payment of this entire note of $570,000.00 shall be and remain secondary and inferior to the liens securing the hereinabove described $191,303.14 promissory note payable to David Melton O'Dell, M.D. and wife, Carolyn Lee O'Dell.* It is hereby expressly stipulated that should default be made in the payment of said $191,303.14 note, or any part thereof, principal or interest, as the same shall become due and payable, or in any of the covenants of the Deed of Trust securing same, the *entire* indebtedness evidenced by this $570,000.00 note, at the option of the holder hereof, shall at once become due and payable.

3. The Bank expended great effort to customize the loan documents to carefully segregate the property on which it claimed a first lien and the limited $189,000 extent of the claimed first lien, but it nevertheless contained a statement found in conventional refinance loan documents, which in this situation is false. Both the $570,000 note and its deed of trust recite "given in renewal and extension of the combined sum of $189,088.95 left *owing* and unpaid by Grantors herein upon the" first and second lien notes (emphasis added). The emphasized language is false, of course, since none of the Grantors was liable on or owed anything on the notes purportedly renewed and extended. This critical distinction separates the Bank's position here from that of the financial institutions in thousands of ordinary refinance transactions in which an indebtedness is truly being renewed, modified and extended—refinanced—in reliance on the equitable subrogation doctrine.

likewise the purchaser at his foreclosure sale. When O'Dell subsequently claimed rights under his foreclosure sale, the Bank again asserted that O'Dell's "third lien" deed of trust had been extinguished as a junior encumbrance by the Bank's prior foreclosure sale in August. The Bank claimed that O'Dell had no right to any part of the property as a result of his foreclosure.[4]

O'Dell sued the Bank to have its foreclosure sale declared invalid. O'Dell tendered into the registry of the court almost $195,000 as the total sum of principal and interest then due on the Davis first lien note and Walters second lien note, with a representation of willingness and ability to pay "such other sums as this Court may require" to pay the first and second lien indebtedness. O'Dell sought to exercise the option that the notice provisions of those note would have allowed him. Upon being informed of the default, he would have the option to pay the first and second lien notes, extinguish the liens securing them, and thereby improve his own lien position.[5]

The Bank counterclaimed for declaratory judgment that it did not have to give O'Dell notice of the foreclosure sale, and that its foreclosure was in all respects valid and proper. The Bank alleged that its foreclosure sale cut off O'Dell's "third lien" through the equitable subrogation doctrine. The Bandera Ranch Partnership and related entities were joined under causes of action not material here.

The parties stipulated to a large quantity of documents and related facts. They generated significant other summary judgment evidence. O'Dell moved for partial summary judgment against the Bank. The Bank opposed his motion and filed its own cross-motion for summary judgment against him, which O'Dell opposed.

The trial court generally granted the Bank's motion for summary judgment, and denied O'Dell's motion. The court ordered a severance to produce an appealable judgment. The trial judge signed a summary judgment that was procedurally defective and improper for reasons we address below in the disposition of this cause. For now we address why the trial court erred in its decision that the substantive law favored the Bank.

The Bank argues it was able to cut off O'Dell's third lien as to the 190 acres without notice to O'Dell under the equitable subrogation doctrine. It argues that the Bandera Ranch Partnership, though not an obligor under either the Davis first lien note or the Walters second lien note, was a "subject to" owner of the property and therefore could "assume" liability under such notes without notice to O'Dell. The Bank argues that in signing the $570,000 note and related loan documents, purporting to modify and extend the indebtedness of such notes, the partnership assumed that indebtedness. The Bank further asserts that its legal conclusion was correct that O'Dell was no longer an "obligor" under such notes, and therefore not entitled to foreclosure notice under section 51.-002 of the Property Code.[6] The Bank reasons that upon the partnership's "assumption" of the debt by signing the $570,000 note, O'Dell became at most a surety on the notes, and that his suretyship obligations were discharged because the new

---

**4.** In oral argument counsel for the Bank admitted that O'Dell's interest was superior to the Bank's, and that the O'Dell foreclosure cut off the Bank's rights, as to the 47 acre tract. The Bank's own loan documents, as well as the admissions by the its counsel in oral argument, demonstrate that the O'Dell foreclosure was of a *first lien* as to the 47.35 acre tract. The Bank had no colorable claim as to that portion of the ranch after O'Dell foreclosed.

**5.** *See generally* Grant Nelson & Dale Whitman, Real Estate Finance Law § 7.2 (1985) ("[T]he law favors redemption by anyone who has an interest in the mortgaged premises who would be a loser by foreclosure.").

**6.** Tex.Prop.Code Ann. § 51.002(b)(3) requires that:

(b) Notice of the sale must be given at least 21 days before the date of the sale:

\* \* \* \* \* \*

(3) by the holder of the debt to which the power of sale is related by serving written notice of the sale by certified mail on each debtor who, according to the records of the holder of the debt, is obligated to pay the debt.

note and loan documents materially altered the obligation by eliminating his notice and time to cure default rights. Thus the Bank argues that these legal doctrines actually work to O'Dell's detriment, by eliminating his right to receive notice.

The Bank has not cited a single case, nor have we located one, in which this court has held that one who is not even an obligor under a note, may "renew and extend" the note so that the equitable subrogation doctrine applies. We have concluded that it is more consistent with the policy of our equitable subrogation decisions that such a non-obligor may *not* trigger application of that doctrine.

When the Bank purchased the Davis and Walters notes, no party for whom the Bank was "paying off" the notes was liable on either of them. In applying the equitable subrogation doctrine, this court has always made it clear that the payment had to be *for the benefit* of the *debtor*—i.e., an *obligor* on the debt—at the time of the "subrogation" transaction, for the doctrine to apply. As stated in *Faires v. Cockrill*, 88 Tex. 428, 437, 31 S.W. 190, 194 (1895) (emphasis added):

> One who discharges the *vendor's lien* upon lands,—even the homestead,—either by *paying as surety*, or *at the request of the debtor*, or at a *judicial sale*, which, for irregularities of the process, fails to convey the title, is entitled to be subrogated to the lien of the creditor to the extent of the payment so made. [Citations omitted.]

As the court further explained in *Oury v. Saunders*, 77 Tex. 278, 280, 13 S.W. 1030, 1031 (1890) (emphasis added):

> It is said by the same author that "the doctrine of subrogation is not applied for the mere stranger or volunteer who has paid the debt of another, without any assignment or agreement for subrogation, without being under any legal obligation to make payment, and without being compelled to do so for the preservation of any rights or property of his own." Such a payment would extinguish the debt. Sheld. on Sub., secs. 240, 241. But the same authority adds that "one

who pays a debt *at the instance of the debtor* under such circumstances that it appears to have been contemplated by the parties that he should become entitled to the benefit of the security for the debt held by the creditor *from the debtor*, may as against the *debtor* be subrogated to the benefit of such security and of the debt which he has discharged. A party who has paid the debt *at the request of the debtor*, and under circumstances which would operate a fraud upon him if the debtor were afterwards allowed to insist that the security for the debt was discharged by his payment, may also be subrogated to security as against the debtor." [Citations omitted.]

Here, when the Bank "paid off" the first and second liens by purchasing the notes, it was not at the instance of any *debtor* on the notes, and the equitable subrogation doctrine by its literal terms would not apply.

In the same line of analysis, applying the equitable subrogation doctrine as the Bank urges here would be contrary to this court's stated purpose for the doctrine. In general, that purpose is to prevent the unjust enrichment of the *debtor* who owed the debt that is paid. *Smart v. Tower Land and Inv. Co.*, 597 S.W.2d 333, 337 (Tex.1980); *see also* RESTATEMENT OF RESTITUTION § 162 (1937). Rather than unjustly enriching O'Dell, the only debtor under the obligations alleged to have been equitably subrogated, he was deprived of his rights in the 190 acre tract.

The situation we have here is that the purchaser of the real property signs only a non-recourse note to the seller, providing for no personal liability and that the seller will look only to the third lien on the property for all payment under the note in the event of any default. The new "owner" has no personal liability under either the first or second or third lien note. Though not an "obligor" under any note, the new owner is a "maker" of the third lien note only. The interest in having payments on the first lien made is to prevent foreclosure on the property, but the new owner may walk away from the property at

any time with no personal liability. The question presented is, may this type of non-obligor party unilaterally renew, modify and extend the first and second lien notes into a new note under the "equitable subrogation" doctrine, to make the original owner who is an express obligor a "non-obligor" and cancel the seller's right to notice of foreclosure? The answer is "no." We hold that the party must at least be an obligor *before* the renewal transaction for the doctrine to apply.

There is an additional reason for rejecting the Bank's claim for equitable subrogation. O'Dell had no notice of the foreclosure and, under the Bank's theory of equitable subrogation, no way to protect his extensive third lien interest in the property. O'Dell had agreed to look only to the property for payment of the partnership note to him. The Bank held a fourth lien. There was summary judgment evidence that the value of the property on the date of foreclosure far exceeded the approximately $195,000 bid in by the Bank. The Bank through its "secret" (as to O'Dell) foreclosure would obtain the title and extra equity (excess value) in the property to reduce its actual loss on the remainder of the $570,000 note. At the same time, O'Dell would be deprived of the property, which was his *only recourse* for payment of his note. In other words, the Bank in practical effect would be able to place at least part of its fourth lien ahead of O'Dell's third lien. In purely equitable subrogation, each case is usually governed by its own facts. *Providence Inst. for Sav'gs v. Sims,* 441 S.W.2d 516, 519 (Tex. 1969). We would not allow such an inequitable result under the guise of "equitable" subrogation.

The trial court's rendition of summary judgment for the Bank was error. Though our holding suggests we should render an appropriate judgment for O'Dell on the competing motion for summary judgment, we decline to do so for a number of procedural reasons. First, the severance order contained in the judgment recited that the claims *against* the Bank and its trustee were placed in the severed cause. The Bank also had declaratory judgment and other pleadings for affirmative relief. It is not clear that the whole controversy between these two sets of parties is before the court. The judgment does not state, attach or otherwise set forth a metes-and-bounds description of the "subject property," and the references make it unclear whether the trial court separated the 190 acre tract from the 47 acre tract. Separate treatment is necessary because of the differing lien positions. The judgment further directs the return of the approximately $195,000 O'Dell deposited in the registry of court. We assume O'Dell remains ready to "do equity"[7] and tender such amounts to pay the first and second liens, but such an issue is best handled by remanding the cause to the trial court. Even assuming the Bank's attempt to have non-obligors modify and extend the first and second lien notes to modify the notice requirement to O'Dell operated to release O'Dell from personal liability, O'Dell still had his rights in the property "subject to" the liens and notes. The obligations became of the nature of non-recourse notes for which O'Dell was not personally liable but which were collateralized by liens to which the 190 acres was subject. The equitable subrogation doctrine was not created to do inequity. Although the Bank can purchase or assume the Davis and Walters notes, upon foreclosure proceedings, O'Dell retains the right to notice of default and the concomitant right to redeem the first and second liens and improve his lien's priority in the hierarchy of liens on the property. The doctrine of equitable subrogation does not provide the Bank with an offensive tool to defeat O'Dell's right to notice under the Davis and Walters notes and thereby to maintain the priority of his lien ahead of the Bank's. We reverse the judgment of the court of appeals and remand the cause to the trial court.

---

**7.** *See Johnson v. Cherry,* 726 S.W.2d 4, 8 (Tex. 1987).