LaSALLE BANK NATIONAL ASSOCI-
ATION, a/k/a LaSalle National Bank,
as Trustee and LaSalle National Bank
as Trustee Under the Pooling and Ser-
vices Agreement Dated June 1, 1999,
Series 1999–2, Appellant,

v.

Lorae WHITE and Gerald
Geistweidt, Appellees.

No. 04–05–00548–CV.

Court of Appeals of Texas,
San Antonio.

Oct. 11, 2006.

Frank Oliver, Oliver & Oliver, P.C., Austin, Lindsay Lambert, Hughes Watters & Askanase, L.L.P., Houston, for appellant.

Gerald Geistweidt, Rebekah Whitworth, Geistweidt Law Office, Mason, for appellees.

Sitting: ALMA L. LÓPEZ, Chief Justice, CATHERINE STONE, Justice, SARAH B. DUNCAN, Justice, KAREN ANGELINI, Justice, SANDEE BRYAN MARION, Justice, PHYLIS J. SPEEDLIN, Justice, REBECCA SIMMONS, Justice.

## OPINION

Opinion by ALMA L. LÓPEZ, Chief Justice.

This court's panel opinion and judgment dated May 3, 2006, are withdrawn, and this opinion and judgment are substituted. We substitute this opinion because a majority of the en banc court disagreed with the panel's disposition of the appeal.

LaSalle Bank National Association a/k/a LaSalle National Bank, as Trustee and LaSalle National Bank, as Trustee Under the Pooling and Servicing Agreement dated June 1, 1999, Series 1999–2 (collectively "LaSalle Bank"), appeals a judgment forfeiting its right to receive payment under a home equity note and cancelling its lien against property securing the payment of the note. LaSalle Bank presents three issues on appeal: (1) the home equity extension of credit did not violate Texas Constitution article XVI, section 50(a)(6)(L) because the scheduled payments were substantially equal in amount and were sufficient to pay the accrued

interest owed as of the date of the scheduled installment; (2) the home equity extension of credit was not secured by homestead property designated for agricultural use; and (3) if the home equity extension of credit was constitutionally invalid, LaSalle Bank was entitled to equitable subrogation for the portion of the loan proceeds used to pay Lorae White's existing purchase money lien and outstanding property taxes.

## BACKGROUND

On March 24, 1999, White executed a Texas Home Equity Note. The lender was Alliance Funding, which assigned the note to LaSalle Bank. The note was in the principal amount of $260,000.00, and provided that it was an extension of credit defined by section 50(a)(6), Article XVI of the Texas Constitution. Under the note, interest would be charged on the unpaid principal at a yearly rate of 13.450%. Payments in the amount of $2,967.85 would be paid on the 26th of each month beginning on April 26, 1999, and any amounts still owing under the note on March 26, 2029 would be paid in full on that date. The note was secured by a lien against 10.147 acres of land, which was a portion of a 53.722 acre tract owned by White.

At the time the note was executed, a third party, Joe Di Sebastiano, held a valid purchase money lien against the 53.722 acre tract securing a debt in the amount of $185,010.51. The debt to Di Sebastiano was paid off with a portion of the home equity loan proceeds. In addition, outstanding property taxes in the amount of $9,410.96 were paid. The remaining balance, $57,518.50, was advanced directly to White.

White did not make her first payment under the note until July 1999. She made a few additional payments, but did not make any payments after December 1999.

On September 18, 2001, LaSalle Bank filed an application for a home equity loan foreclosure. On November 8, 2001, White filed a separate lawsuit seeking a declaratory judgment that LaSalle Bank had forfeited all principal and interest because the loan violated the Texas Constitution. White also sought a declaration that the lien against the property was invalid. Attorney Gerald Geistweidt was later added as a party to the lawsuit after he was conveyed an undivided one-third interest in White's 53.722 acre tract of land. Following a bench trial, the court signed a judgment quieting title free and clear of any liens or claims asserted by LaSalle Bank.

## PROPERTY DESIGNATED FOR AGRICULTURAL USE

■ The trial court found that the property was designated for agricultural use and, therefore, the Constitution prohibited it from being used as security for a home equity loan. LaSalle Bank argues that the constitutional bar applies only to land designated for agricultural use under Texas Tax Code chapter 23, subchapter C. Because it is undisputed that White's property was designated under subchapter D, and not subchapter C, LaSalle Bank contends the constitutional bar does not apply. We disagree.

The Texas Constitution prohibits "homestead property designated for agricultural use as provided by statutes governing property tax" from being pledged to secure a home equity loan unless the property "is used primarily for the production of milk." TEX. CONST. art. XVI, § 50(a)(6)(I). It is undisputed that White did not use her property for the production of milk. Therefore, the issue is what constitutes "property designated for agricultural use as provided by [t]he statutes governing property tax."

Tax Code subchapter C is entitled "Land Designated for Agricultural Use." *See* TEX. TAX CODE ANN. §§ 23.41–23.47 (Vernon 2001). The phrase "land designated for agricultural use" is used throughout subchapter C. *See id.* Section 23.42 sets forth the eligibility requirements a person must satisfy in order for his land to be "designated for agricultural use" and includes a requirement that agriculture be the owner's primary occupation and primary source of income. TEX. TAX CODE ANN. § 23.42 (Vernon 2001). Section 23.43 sets forth the application process to be followed by an individual claiming the right to have his land "designated for agricultural use." TEX. TAX CODE ANN. § 23.43 (Vernon 2001).

Tax Code subchapter D is entitled "Appraisal of Agricultural Land." TEX. TAX CODE ANN. §§ 23.51–23.59 (Vernon 2001 & Supp.2005). The phrase "agricultural use" is used throughout subchapter D. *See id.* Section 23.51 defines various terms including "qualified open-space land" and "agricultural use." TEX. TAX CODE ANN. § 23.51 (Vernon Supp.2005). "Qualified open-space land" is "land that is currently devoted principally to agricultural use to the degree of intensity generally accepted in the area and that has been devoted principally to agricultural use or to production of timber or forest products for five of the preceding seven years or land that is used principally as an ecological laboratory by a public or private college or university." *Id.* § 23.51(1). "Agricultural use" includes some of the following activities: "cultivating the soil, producing crops for human food, animal feed, or planting seed or for the production of fibers; . . .; raising or keeping livestock; . . .; and planting cover crops or leaving land idle for the purpose of participating in any governmental program or normal crop or livestock rotation procedure." *Id.* § 23.51(2). Section 23.52 sets forth the manner in which the "ap-

praised value of qualified open-space land" is determined. TEX. TAX CODE ANN. § 23.52 (Vernon 2001).

■ Subchapters C and D were enacted to implement Article VIII, sections 1–d and 1–d–1 of the Texas Constitution. *See HL Farm Corp. v. Self,* 877 S.W.2d 288, 290–91 (Tex.1994). Section 1–d is entitled "Assessment of lands designated for agricultural use." TEX. CONST. Art. VIII, § 1–d. With regard to the statutory requirement that agriculture be the primary occupation and source of income to qualify for this assessment, the Texas Supreme Court has stated that the requirement obviously "was intended to prevent the lower agricultural assessment from being abused by allowing land investors and speculators to reduce their assessments and taxes simply by planting a crop or running livestock on the land." *Gragg v. Cayuga Ind. Sch. Dist.,* 539 S.W.2d 861, 865 (Tex.1976). "The provision also has the salutary purpose of encouraging not only that agricultural and ranch land be continued in production but that farmers and ranchers remain in the business of such production." *Id.*

■ Section 1–d–1 is entitled "Open-space land" and requires the Legislature to "provide by general law for taxation of open-space land devoted to farm, ranch, or wildlife management purposes on the basis of its productive capacity. . . ." TEX. CONST. Art. VIII, § 1–d–1. The Texas Supreme Court has held "that the purpose of section 1–d–1 and sections 23.51 *et seq.* is to promote the preservation of open-space land devoted to farm or ranch purposes." *HL Farm,* 877 S.W.2d at 292. In reaching this conclusion, the Court specifically rejected the holding of a court of appeals in an earlier case that the purpose underlying the Legislature's acts was merely "to preserve and benefit the family farm." *Id.* at 292–93 (quoting *Alexander Ranch, Inc. v.*

*Central Appraisal Dist.*, 733 S.W.2d 303, 307 (Tex.App.-Eastland 1987, writ ref'd n.r.e.)). Similarly, the Court has rejected a district's argument that "farm and ranch purposes" as used in article VIII, section 1–d–1(a) means only traditional farming and ranching. *Nootsie, Ltd. v. Williamson County Appraisal Dist.*, 925 S.W.2d 659, 663 (Tex.1996). "The use of the word 'purposes' indicates that the Legislature can give productive capacity appraisal to property that, although not strictly a farm or ranch, is devoted to the furtherance of farming and ranching purposes so long as the primary intent of the provision, the preservation of open-space land, is not violated." *Id.*

■ Had the drafters of article XVI, section 50(a)(6)(I) intended for that section to apply only to land on which agriculture is the owner's primary occupation and primary source of income, they could have so limited the article's language. Because article XVI, section 50(a)(6)(I) contains no such limitation, we conclude that article XVI, section 50(a)(6)(I)'s use of the phrase "designated for agricultural use as provided by statutes governing property tax" refers to land put to an agricultural use as defined by, and assessed for tax purposes under, both subchapter C and subchapter D of the Tax Code.

The record establishes that, with the exception of one acre, White's land was valued for agricultural use based on the 1998 and 1999 tax rolls. The land valued for agricultural use included the property described in the deed of trust securing LaSalle Bank's note. Smith testified that all appraised land in Mason County valued pursuant to an agriculture use exemption, including White's, was based on Subchapter D of the Texas Property Tax Code.

Evidence was introduced to show that a copy of a tax certificate relating to White's property that identified the property as receiving a special valuation based on its use was located in the files of LaSalle Bank and the title company that closed the transaction. Debra Geistweidt, the chief appraiser and tax collector for Mason County in 1998 and 1999, agreed that White's land was valued under Subchapter D with the exception of one acre. Geistweidt also agreed that the tax certificate in LaSalle Bank's files reflected that White's land was receiving a special valuation. Geistweidt also testified that when White was applying for the loan in question, both Geistweidt and the lender contacted her and asked that ten acres of White's land be changed from agricultural value to market value. Geistweidt informed White and the lender that the valuation could only be changed on the following January 1. On cross-examination, Geistweidt admitted that she did not have a record of who contacted her from the lender and that the call could have been made by White's loan broker.

Because White's land was "designated for agricultural use as provided by [subchapter D of] ... [the] property tax [code]," the Texas Constitution prohibited it from being used as security for a home equity loan.[1]

## EQUITABLE SUBROGATION AND FORFEITURE

■ LaSalle Bank argues in the alternative that if the loan failed to comply with the constitutional requirements, it was equitably subrogated to the liens held by the third parties who were paid the balance of the existing purchase money lien and the

---

1. Because we have determined the Texas Constitution prohibited White's land from being used as security for the home equity loan,

we need not address LaSalle Bank's first issue regarding interest calculation.

accrued ad valorem taxes. Accordingly, LaSalle Bank contends that its rights were not forfeited with regard to the portion of the loan to which its equitable subrogation rights extended. White contends that Article XVI, section 50(e) of the Texas Constitution precludes the application of. equitable subrogation to revive a portion of an invalid home equity loan.

The trial court found that a portion of the loan proceeds were used to pay the purchase money indebtedness to Joe Di Sebastiano and to pay outstanding taxes. These findings are supported by the evidence. White testified that a substantial amount of the loan proceeds went to pay Di Sebastiano who held the lien to White's fifty-three-acre tract that was created when she purchased the property. The record also establishes that a portion of the loan proceeds were used to pay outstanding property taxes. The trial court concluded, however, that LaSalle Bank was not entitled to equitable subrogation for the amount paid to Di Sebastiano or for the taxes because Article XVI, section 50(e) bars any lien based upon equitable subrogation.

Section 50(e) provides that a refinance of debt secured by a homestead and of the type described in subsections(a)(1)-(a)(5) that includes the advance of additional funds may not be secured by a valid lien against the homestead unless:

> (1) the refinance of the debt is an extension of credit described by Subsection (a)(6) of this section; or
>
> (2) the advance of all the additional funds is for reasonable costs necessary to refinance such debt or for a purpose described by Subsection (a)(2), (a)(3), or (a)(5) of this section.

Tex. Const. art. XVI, § 50(e). LaSalle Bank does not contend that it meets the conditions imposed by section 50(e). Instead, LaSalle Bank asserts that the doctrine of equitable subrogation is not eliminated by section 50(e). We disagree.

When interpreting our state constitution, we rely heavily on its literal text and must give effect to its plain language. *Doody v. Ameriquest Mort. Co.*, 49 S.W.3d 342, 344 (Tex.2001). We strive to give constitutional provisions the effect their makers and adopters intended. *Id.* The Constitution and statutes zealously guard the rights of a homestead, and a lien thereon can be acquired only by a strict compliance with the provisions thereof. *Collier v. Valley Bldg. & Loan Ass'n*, 62 S.W.2d 82, 84 (Tex. Comm'n App.1933, holding approved). Any attempt to mortgage homestead property, except as approved by the Texas Constitution, is void. *Laster v. First Huntsville Properties Co.*, 826 S.W.2d 125, 129–30 (Tex.1991).

The home equity loan in this case is not simply a "contract" but only exists by means of a constitutional amendment. The constitution imposes specific restrictions and requirements on home equity loans, and the failure to comply with the constitutional restrictions and requirements results in forfeiture if the lender fails to comply with its obligations within a reasonable time after the lender is notified of the lender's failure to comply. Tex. Const. art. XVI, § 50(a)(6)(Q)(x).

LaSalle Bank concedes that it failed to comply with the specific restrictions imposed on home equity liens that include an advance of additional funds. LaSalle Bank also failed to comply with its obligations within a reasonable time after it was notified of its failure to comply. The doctrine of equitable subrogation cannot be applied to circumvent the constitutionally-mandated penalty of forfeiture.

In its brief, LaSalle Bank cites *Benchmark Bank v. Crowder*, 919 S.W.2d 657, 661 (Tex.1996), to assert that, "The Texas Supreme Court has even held that there

can be equitable subrogation to support a homestead lien when the lien is not one of the eight types authorized in Texas Constitution art. XVI, § 50(a)." However, in *Crowder*, the Texas Supreme Court expressly stated:

> At the outset we note that Texans approved by election on November 7, 1995, a constitutional amendment that would permit an encumbrance against a homestead for the refinance of a lien against a homestead, including a federal tax lien. TEX. CONST. art. XVI, § 50 (1876, amended 1973 and 1995). That amendment, however, has no bearing on our disposition of this case because the tax lien and the Bank's subrogation rights were fixed before the amendment's adoption. *See* TEX. CONST. art. XVII, § 1 (amended 1972) (an amendment becomes a part of the Constitution upon the majority of votes cast in favor of the amendment and proclamation made by the Governor).

919 S.W.2d at 660. Accordingly, *Crowder* provides no support for the proposition that an equitable doctrine can provide relief to a lender who violates the express provisions of the Texas Constitution. The lien in this case is not invalid "simply because the original debt has been refinanced." *Id.* at 661. The lien in this case is invalid because the original debt was refinanced in violation of the constitutional conditions for having a valid home equity lien in a refinancing transaction. Under these circumstances, equitable subrogation does not trump the constitutionally-mandated penalty of forfeiture.

## CONCLUSION

The trial court's judgment is affirmed.

Concurring and dissenting opinion by SANDEE BRYAN MARION, Justice, joined by REBECCA SIMMONS, Justice.

I agree with the majority's conclusion that because Lorae White's land was designated for agricultural use, the Texas Constitution prohibited it from being used as security for a home equity loan. However, I disagree with the majority's conclusion that equitable subrogation does not trump the constitutionally-mandated penalty of forfeiture. On that issue, I would hold that LaSalle Bank is entitled to equitable subrogation for the amount paid to satisfy the first lien on the property and the property taxes. Therefore, I respectfully dissent.

## EQUITABLE SUBROGATION AND FORFEITURE

Article XVI, Section 50(e) of the Texas Constitution sets forth the terms and conditions that a contractual home equity loan must meet in order to create a valid lien against a homestead. However, I do not believe Article XVI, Section 50(e) prohibits a court from applying well-established equitable principles to avoid an inequitable windfall to a homeowner.

Equitable subrogation arises by operation of law or by implication in equity to prevent injustice. *Harris v. American Protection Ins. Co.*, 158 S.W.3d 614, 622 (Tex.App.-Fort Worth 2005, no pet.). Under the doctrine of equitable subrogation, a third party who pays a debt at the request of the debtor, may under certain circumstances, be subrogated to the creditor's security interest for the debt that has been discharged. *First Nat'l Bank of Kerrville v. O'Dell*, 856 S.W.2d 410, 415 (Tex.1993); *see also Langston v. GMAC Mortg. Corp.*, 183 S.W.3d 479, 481 (Tex. App.-Eastland 2005, no pet.) (applying equitable subrogation to enforce home equity lien). The purpose of the doctrine is to prevent the unjust enrichment of the debtor who owed the debt that is paid. *O'Dell*, 856 S.W.2d at 415. "Application of the

doctrine is said to be 'the purest of equities,' and the courts of Texas are said to be particularly hospitable to it." *Interfirst Bank Dallas, N.A. v. U.S. Fidelity & Guar. Co.,* 774 S.W.2d 391, 397 (Tex.App.-Dallas 1989, writ denied) (quoting *Yonack v. Interstate Sec. Co.,* 217 F.2d 649, 651 (5th Cir.1954)).

I believe the majority erroneously concludes that the Texas Supreme Court's decision in *Benchmark Bank v. Crowder,* 919 S.W.2d 657 (Tex.1996) "provides no support for the proposition that an equitable doctrine can provide relief to a lender who violates the express provision of the Texas Constitution." In *Crowder,* Mr. and Mrs. Crowder borrowed money from a bank to pay federal taxes. They signed a note and gave the bank a deed of trust purporting to create a lien against their homestead. After the Crowders defaulted on the note and the bank foreclosed, the Crowders sued the bank claiming the lien against the homestead was invalid. The bank argued it was subrogated to a valid lien against the homestead, even though federal tax liens were not within those specifically identified as valid in the then existing version of Article XVI, Section 50 of the Constitution. The trial court granted summary judgment in favor of the bank; the court of appeals reversed concluding "that the Bank's attempt to obtain or enforce the IRS's tax lien was precluded by the homestead protection afforded under the Texas Constitution"; and the Supreme Court reversed holding that the bank was both contractually and equitably subrogated to the federal government's tax lien against the Crowders' homestead.

The Supreme Court first noted the passage of the constitutional amendment permitting an encumbrance against a homestead for the refinance of a lien against a homestead, including a federal tax lien. *Crowder,* 919 S.W.2d at 660. However, the Court determined the amendment permitting a lien for federal taxes had no bearing on its disposition of the case because the tax lien and the Bank's subrogation rights were fixed before the amendment's adoption. *Id.* Therefore, the Court proceeded to "determine whether, in the absence of the amendment to Article XVI, Section 50, the Bank obtained through subrogation a valid and enforceable lien against the Crowders' homestead." *Id.* In concluding the Bank was contractually and equitably subrogated to the federal government's tax lien against the Crowders' homestead, the Court reasoned as follows:

We have previously held that a third party who refinances a debt secured by a valid mechanic's lien against a homestead may be subrogated to the lien. We see no difference between the refinancing of debt secured by a mechanic's lien and the refinancing of debt secured by a federal tax lien. Once valid, the lien does not become invalid against the homestead simply because the original debt has been refinanced. To hold otherwise, in fact, would defeat the very purpose of the homestead protection. Homestead owners must have the ability to renew, rearrange, and readjust the encumbering obligation to prevent a loss of the homestead through foreclosure.

*Id.* at 661 (citations omitted).

Thus, the *Crowder* Court applied equitable subrogation to validate a lien that was otherwise not valid under Article XVI, Section 50. I believe *Crowder* supports the continued application of equitable subrogation in appropriate circumstances, such as those presented here. White benefitted from the loan made to her by LaSalle Bank because she used the loan proceeds to "renew, rearrange [or] readjust the encumbering obligation[s]" on her homestead. *See id.* Of the $260,000.00 White borrowed, $185,010.51 was paid to

Joe Di Sebastiano to satisfy the purchase money lien on the property and $9,410.96 was paid to satisfy outstanding taxes on the property. The remaining amount, $57,518.50 was paid directly to White. I believe LaSalle Bank is entitled to equitable subrogation for the amount paid to Di Sebastiano and for the taxes. To hold otherwise would defeat the very purpose of the doctrine of equitable subrogation, which is "to prevent the unjust enrichment of the debtor who owed the debt that is paid." *See O'Dell*, 856 S.W.2d at 415. In my opinion, to "prevent injustice," the windfall to White demands application of the doctrine of equitable subrogation. *See Harris*, 158 S.W.3d at 622. Accordingly, I believe the forfeiture provisions of Article XVI, section 50(e) do not apply here.