NO. 07-07-0058-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL C

SEPTEMBER 24, 2007

______________________________

JAMES N. MEADOR and MELISSA A. MEADOR, 

Appellants

v.

EMC MORTGAGE CORPORATION, 

Appellee

_________________________________

FROM THE 169
TH
 DISTRICT COURT OF BELL COUNTY;

NO. 211660-C; HON. GORDON G. ADAMS, PRESIDING

_______________________________

Opinion

_______________________________

Before QUINN, C.J., and HANCOCK and PIRTLE, JJ.

James N. Meador and Melissa A. Meador (the Meadors) appeal from a summary judgment granted in favor of EMC Mortgage Corporation (EMC) and the denial of their own motion for summary judgment.  They had sought a judgment declaring that the principal and interest on an unsecured loan owned by EMC should be forfeited because the loan transaction failed to comply with the homestead lien provisions in the Texas Constitution, 
Tex. Const. 
art. XVI, §50.
  We affirm the summary judgment.

Background

The dispute arises from the Meadors’ attempt to acquire an unsecured loan from Conseco Finance Service Corporation.  As a condition for the loan, Conseco required that they also refinance their home mortgage.  However, it is undisputed that the two loans were independent from one another.  That is, two loan applications were completed, and  the default on one did not constitute a default on the other.  Moreover, the homestead lien arising from the refinancing of the mortgage would not and did not cover repayment of the unsecured consumer loan.  The evidence further revealed that once the loans were consummated, the unsecured consumer transaction was acquired by EMC from Conseco.     
Section 50 of
 
article XVI

Section 50 of article XVI of the Texas Constitution protects a person’s homestead from forced sale for the payment of most debts except those enumerated in subsection (a).  
Stringer v. Cendant Mortg. Corp., 
23 S.W.3d 353, 354 (Tex. 2000).  While the consumer loan which is the subject of this dispute is not secured by a lien on the Meadors’ homestead, they nonetheless rely on subsection (e) to bring it within the scope of §50.  The latter provides that:

A refinance of debt secured by a homestead and described by any subsection under Subsections (a)(1) - (a)(5) that includes the advance of additional funds may not be secured by a valid lien against the homestead unless:

(1) the refinance of the debt is an extension of credit described  by Subsection (a)(6) of this section; or

(2) the advance of all the additional funds is for reasonable costs necessary to refinance such debt or for a purpose described by Subsection (a)(2), (a)(3), or (a)(5) of this section.

Tex. Const.
 art. XVI, §50(e).  According to the Meadors, the consumer loan comprised “the advance of additional funds” under §50(e) even though it was unsecured.  Thus, both loans allegedly had to satisfy the requirements of §50 in general.  We disagree.

Interpretation 
of 
§50

In construing the constitution, we use the same guidelines used in construing statutes.  
Rooms With a View, Inc. v. Private Nat’l Mortg. Ass’n, Inc., 
7 S.W.3d 840, 844 (Tex. App.–Austin 1999, pet. denied).  Those guidelines require us to give effect to the intent of the framers of the constitution by considering the purpose of the provision and the historical context in which it was written.  
Ex parte Austin Indep. School Dist., 
23 S.W.3d 596, 600 (Tex. App.–Austin 2000, pet. ref’d).  Finally, we must interpret the words of the constitution as generally understood and rely heavily on the plain language of the literal text.  
Spradlin v. Jim Walter Homes, Inc., 
34 S.W.3d 578, 580 (Tex. 2000).  

Here, we are asked to discern what was meant by the phrase “the advance of additional funds.”  The Meadors opined that it included unsecured loans made in conjunction with refinancing a mortgage on the homestead.  In turn, EMC asserted that it only encompasses loans the repayment of which was secured by a lien on the homestead.  EMC posits the accurate interpretation.  

The plain language of §50(e) talks about the “refinance of debt secured by a homestead and . . . that includes the advance of additional funds . . . .”  
Tex. Const.
 art. XVI, §50(e).  The words being so juxtaposed, we cannot but construe the phrase “the advance of additional funds” to be a subset of the overall debt being refinanced and secured.  In other words, “additional funds” are monies obtained in excess of the pre-existing debt being refinanced, and when the two are combined, the repayment of the total is to be secured by a lien on the homestead.  This interpretation is not only reasonable and logical but finds support in the history and purpose of art. XVI, §50.  Through the latter, the Texas populace sought means to protect one’s homestead against loss due to an inability to pay debt.  Thus, the homestead could be encumbered only for limited purposes.  That historical concept remains the focus of §50, the concept being the regulation and limitation of liens against the homestead.

In this instance,  two separate loan applications were submitted, and two separate loans were made.  Only one loan was secured by a lien on the homestead, however, and that loan was not the one acquired by EMC.  The mere fact that the initial lender required that both be obtained from it does not, as the Meadors contend, render the two loans inseparable.  If that was the case, then both loans would had to have been assigned to EMC, and they were not.
(footnote: 1)  So, we cannot but conclude that the phrase “advance of additional funds” contemplates additional funds the repayment of which is secured through a lien contemplated by art. XVI, §50. 

We overrule all of the Meadors’ issues since they are dependent upon reading §50 in a manner different than that we adopt and affirm the summary judgment. 

Brian Quinn 

          Chief Justice 
  
 
 

æÆåßÑthrough the area and down the particular alley in search of gas to steal or items from which gas could be obtained.  And, though he initially suggested that he was willing to ask people he encountered while going through the area for money, he ran from the only person he met.  Moreover, he was cognizant of the art of burglarizing homes given his prior conviction for the same.
(footnote: 1)  So too did he have a tool that could be used to gain entrance through locked doors readily available on (rather than under or behind) the seat of his truck and that tool had been modified to facilitate forced entry.  Most importantly, the tool had a black substance on it that apparently left black residue, and black residue was found in the pry marks (which marks were not present when the homeowners left).  Finally, no one else was found at the scene.  

Appellant’s having a need for money, his picking a particular area for the purpose of committing some theft late at night, his possession of a pry bar or tire iron suitable and adapted for committing burglary, his presence at the scene when the burglar alarm sounded, the evidence that the burglar alarm was set to trigger when someone entered through a door or window, the similarity in color between the residue emitted from the tire iron and found in the pry marks, his attempt to flee when confronted, the absence of evidence indicating that anyone else was present, and the absence of items from the house constitute some evidence from which a rational factfinder could infer, beyond reasonable doubt, that appellant entered the abode.  

That none of the missing items were found on his person or in the truck is troubling, as is the evidence that the debit card was used by someone while appellant sat in jail and that the doors were locked.
(footnote: 2)  While this suggests that someone other than appellant acquired at least one of the stolen items, it does not necessarily disprove his entry into the abode.  Indeed, it could be that during the chase appellant was discarding the items taken and that the debit card was later found by someone else.  Admittedly, this possibility went undeveloped at trial.  So too was it possible that someone else was with appellant at the time for Officer Ponder stated that such a person would have had enough time to leave while the officer gave chase and fought with appellant.  Be that as it may, neither proposition finds support in the record; yet because they are potential logical explanations of how someone other than appellant was using the card, we cannot say that evidence of someone else using it requires one to infer that someone other than appellant committed the burglary.  Use of the card by a third party 
is a piece of the puzzle that does not readily fit but it does not prevent a viewer from nonetheless recognizing the picture displayed by the remaining pieces.  

Nor can we say that the fact that the doors were locked causes great concern.  Testimony appears of record indicating that though a door is pried open, it can often be closed and locked after the forced entry.  And, while appellant contradicted much of what Officer Ponder said, that simply raised questions of fact and credibility for the factfinder to resolve.  
In
 
toto
, we cannot say these circumstances were of such import so as to undermine our confidence in the verdict, especially in view of appellant’s possessing burglary implements, his avowed need for money and intent to commit theft, his effort to flee, his presence at the scene and near the time the alarm sounded, and the similarity between the residue on the door and on the tire tool.  Thus, we conclude that the evidence was both legally and factually sufficient to support the conviction of burglary of a habitation.

Having overruled appellant’s issues, we affirm the judgments.

Brian Quinn

          Chief Justice

Do not publish.

FOOTNOTES
1:
The situation before us is distinguishable from that in 
LaSalle Bank National Association v. White, 
217 S.W.3d 573 (Tex. App.–San Antonio 2006, pet. filed)
,
 a case upon which the Meadors  rely.  In 
LaSalle
, the parties agreed that the loan was an extension of credit as defined in §50.  We have no such agreement here 
viz
 the consumer loan that EMC bought.  

1:
2: